**HORIZON AIR INDUSTRIES, INC.**
**d/b/a Horizon Air, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF**
**TRANSPORTATION, Respondent,**

San Juan Airlines, Inc.,
Intervenor (Two Cases).

Nos. 87–1429, 87–1747.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 3, 1988.

Decided June 28, 1988.

Marshall S. Sinick, with whom Scott T. Kragie and Stephen A. Alterman, Washington, D.C., were on the brief, for petitioner.

Robert D. Young, Atty., Dept. of Transp., with whom B. Wayne Vance, General Counsel, Kenneth N. Weinstein, Deputy Asst. General Counsel and Thomas L. Ray, Atty., Dept. of Transp., Washington, D.C., were on the brief, for respondent. Robert B. Nicholson and Laura Heiser, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondent.

Aaron A. Goerlich, Eileen M. Gleimer and James M. Burger, Washington, D.C., were on the brief for intervenor, San Juan Airlines, Inc.

Before EDWARDS and WILLIAMS, Circuit Judges, and WEIGEL [*], Senior District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

We deal here with a vestige of the system of air transport regulation that prevailed from the passage of the Civil Aeronautics Act of 1938, Pub.L. No. 75–706, 52 Stat. 973 (1938), until the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705 (1978) (codified in scattered sections of 49 U.S.C.). The former allowed carriers to enter specific markets only on approval of the Civil Aeronautics Board and to charge only rates approved

---

[*] Of the U.S. District Court for the Northern District of California, sitting by designation pursuant to 28 U.S.C. § 294(d).

by the Board. For purely domestic interstate markets, deregulation eliminated government control over entry and prices, the architects expecting that open entry would drive rates to competitive levels. *See Civil Aeronautics Board Practices and Procedures, Report of the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary of the United States Senate,* 94th Cong., 1st Sess. 62–63 (1975). But because foreign nations did not move with us to a system of open entry, Congress reserved for the Department of Transportation the task of selecting American carriers for routes that remained subject to entry control. *See* 49 U.S.C. § 1371 (1982) (governing issuance of certificates of public convenience and necessity); 49 U.S.C. § 1551(b)(1)(B) (1982) (transfer of functions of CAB); 49 U.S.C. § 1551(a) (1982) (eliminating domestic route and rate regulation).

In January 1987 Canada and the United States agreed to allow one carrier from each nation to provide non-stop commuter-type service—in effect service with planes having 60 or fewer seats [1]—between Seattle–Tacoma and Vancouver. This was to supplement the existing non-stop service in large commercial jets offered by United and Pacific Western. Horizon Air and San Juan Airlines applied for the United States slot. The Department initially opted for Horizon, but, characterizing the matter as a "very close case," it cast its decision as an order to interested persons to show cause why it should not persevere in that view. *Seattle–Vancouver Service Case,* Dkt. No. 44716, Order 87–6–11 (June 5, 1987) ("Show Cause Order"), *reprinted in* Joint Appendix ("J.A.") at 17–27. San Juan responded vigorously to the invitation; on the second round it prevailed, receiving exclusive authority for commuter service for

a five-year period. *Seattle–Vancouver Service Case,* Dkt. No. 44716, Order 87–7–53 (July 22, 1987) ("Final Order"), *reprinted in* J.A. at 28–34.

In its final decision the Department focused on San Juan's "historic interest and presence" in the Seattle–Vancouver market, which had taken the form of providing one-stop service via Bellingham. Final Order, J.A. at 29. At the same time, it downgraded the importance that it had initially attached to Horizon's superior "route integration"—i.e., its "behind service" [2] between the gateway city, Seattle–Tacoma, and Portland and Eugene. Final Order, J.A. at 28–31. Finally, it accepted San Juan's argument that its past practice of adding extra sections to popular flights offset the advantages of Horizon's more diverse fleet of aircraft. *Id.* at 33. We will return to these matters in more detail in considering Horizon's objections.

Horizon identifies four faults in the decision, three substantive, one procedural. We consider each in turn, but reject them all.

### I. SAN JUAN'S HISTORIC INTEREST IN THE MARKET

■ In its Final Order the Department noted that the successful applicant would have to fill a niche in a market dominated by the two larger carriers, and determined that San Juan's store of good will in both cities and its "impressive" record as a competitor would give it significant advantages over Horizon, which would start from scratch in Vancouver. *Id.* at 29–30. These pluses, it thought, justified reversing its prior view, which had discounted San Juan's position as "incumbent" in the Seattle–Vancouver market. The Department expressly disclaimed any reliance on the diversion of revenues that San Juan might

---

**1.** The Department defines a "commuter air carrier" as an "air taxi operator" which operates scheduled service five or more times a week between two cities. 14 C.F.R. § 298.2(f) (1987). An "air taxi operator" is in turn defined as a carrier which does not "utilize large aircraft." 14 C.F.R. § 298.3(a)(1). The Department's regulations consider any airplane with more than 60 seats a "large aircraft." 14 C.F.R. § 298.2(i).

**2.** "Behind service," sometimes called "beyond service," refers to service between a U.S. gateway and a second U.S. destination. That is, viewing the route from the foreign city, the second city is "behind" the gateway.

suffer if Horizon were chosen. *Id.* at 33–34.

Horizon's objection to the Department's reliance on San Juan's past participation in the Seattle–Vancouver market has two related strands. First, citing the Department's Notice of Proposed Rulemaking, Limited–Entry Markets ... Procedures and Criteria for Selecting Carriers (the "NPRM"), 50 Fed.Reg. 38,539 (1985), Horizon contends that the Department itself had ruled that incumbency or historic interest was a proper consideration *only* in the context of renewal applications. Horizon Brief at 23–26. We cannot agree.

We note at the outset that literal incumbency could by definition be relevant *only* in the renewal context. Here the Department relied on a sort of quasi-incumbency—San Juan's historic provision of service in a closely related market, that of *one*-stop service between the two cities.

The record flatly contradicts Horizon's theory that the Department explicitly disclaimed interest in incumbency outside the renewal context. It is quite true that in the NPRM the Department said: "This criterion [incumbency] has come into play *only* in the context of renewal applications." 50 Fed.Reg. at 38,547 (emphasis added). Notice that even there the statement is only an empirical observation about past practice. More important, its final policy statement on the matter omitted any such limitation. There the Department simply stated affirmatively that the Department would apply a rebuttable presumption in favor of renewal applicants. *See* Final Rule and Policy Statement, Limited–Entry Markets ... Procedures and Criteria for Selecting Carriers, 51 Fed.Reg. 43,180, 43,187 (1986) ("Policy Statement" or "Statement"). (The full document is entitled "Final Rule and Policy Statement" only because it also contained rules setting five years as the duration of its certificates and requiring 90 days' notice from carriers terminating service. *See id.* at 43,188. The Department expressly reserved its authority to change selection criteria case-by-case rather than by rulemaking. *See* NPRM, 50 Fed.Reg. at 38,539.)

Thus Horizon could prevail on this contention only if it established that the Policy Statement's reference to incumbency in the renewal context carried a negative implication that it should be excluded in all other contexts. Even then, the Department would be free to change views adopted in the Policy Statement so long as it adequately explained the shift. *See Vietnam Veterans of America v. Secretary of the Navy,* 843 F.2d 528, 537–38, 539 (D.C.Cir. 1988). In any event, we think the Department was free to reject Horizon's reading of its Statement.

The Policy Statement explicitly leaves the door open to reliance on unmentioned factors:

> While these criteria represent the major decisional elements in most selection cases, there may be other factors which the Department will wish to consider, depending upon the particular circumstances of each proceeding.

51 Fed.Reg. at 43,187. The sentence is, to be sure, somewhat oddly located, tucked away in a discussion of one specific criterion ("Ability to Enter a Market Quickly"). But other clues confirm its evident meaning. Introducing its discussion of the criteria, the Statement says that the *"major* elements of consideration ... will include the factors listed below," *id.* at 43,186 (emphasis added), leaving open the issue of exclusivity and suggesting that it might consider at least *minor* unlisted factors. Further, at its end the Statement says that "the views of civic parties have historically been afforded substantial weight ... and the Department fully intends to continue this policy." *Id.* at 43,187. As the views of civic parties are not enumerated as selection criteria, the passage suggests nonexclusivity.

But even assuming that the list were intended to be exclusive, we think the Department was entitled to read it as allowing consideration of quasi-incumbency in appropriate non-renewal cases. At least two reasons for favoring incumbents in the renewal context seem relevant to the quasi-incumbency situation as well: their track record suggests the likelihood of future

success, and, because of their established reputation, the incremental costs of securing customers will be relatively low. It would seem a perverse reading of the Policy Statement to say that it disdained consideration of those features even in a case where they were logically just as relevant as in the core case explicitly identified. In any event, the Department's view of its carrier selection criteria is controlling unless it is "plainly erroneous or inconsistent" with the language of the Policy Statement. *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Action Alliance of Senior Citizens v. Bowen,* 846 F.2d 1449, 1457 (D.C.Cir. 1988). As it is not, we decline to find the negative implication urged by Horizon.

Horizon also suggests that the Department's emphasis on San Juan's three years of service in the Seattle–Vancouver market is little more than a thinly veiled attempt to protect San Juan from a possible diversion of traffic and revenues—a factor that, according to the NPRM, the CAB had excluded from consideration in the "era of deregulation." *See* 50 Fed.Reg. at 38,547. Even assuming the Department intended to bar consideration of diversionary effect, we find no violation. In the Final Order the Department explicitly said that it did not consider the diversionary impact on San Juan of awarding the route to Horizon, J.A. at 33–34, and Horizon suggests no reason to question the Department's good faith. Instead the Department stressed the positive reasons to give quasi-incumbency weight—particularly San Juan's reputation and brand name recognition and the value of its track record as an indicator of future service. J.A. at 29–30. We take the Department at its word.

## II. DOT's FAILURE TO EXPLICITLY CONSIDER MARKET STRUCTURE

■ Horizon's second line of attack focuses on "market structure"—"the impact that a route award will have on the overall level of competition in a particular market." Policy Statement, 51 Fed.Reg. at 43,186. The Department's Final Order failed to discuss the competitive effects of the competing applications. Horizon claims that the award to San Juan will spawn less competition than would an award to Horizon and that at least in these circumstances failure to discuss the issue renders the outcome arbitrary and capricious. Horizon Brief at 27–30. We think not.

■ We note at the outset that nothing in the Air Deregulation Act or in the Policy Statement requires the Department to explicitly analyze the effect on market structure in every case. The Act merely stated as a general goal "maximum reliance on competitive market forces," 49 U.S.C.App. § 1302(a)(4); this generalization can hardly be read as a clear directive to focus on competitive effects in inherently non-market-oriented proceedings for award of international routes. As noted above, the Department's Policy Statement simply described and adopted the CAB's unstructured practice of "varying the weight accorded each criterion from case to case, depending on the particular circumstances of each proceeding." Policy Statement, 51 Fed.Reg. at 43,186. In the face of that clearly stated intention, we cannot accept Horizon's claim that the Department has bound itself to analyse the competitive implications in every comparative proceeding, no matter how insignificant the difference between the proposals in this dimension. *See also Frontier Airlines v. CAB,* 439 F.2d 634, 637 n. 4 (D.C.Cir.1971) (CAB need not deal in detail with every aspect of matter in route award proceeding); *Outagamie County v. CAB,* 355 F.2d 900, 906 (7th Cir.1966) (same).

It remains to be determined whether the circumstances of *this* case were such that the Department ought to have addressed itself to the asserted anti-competitive effects of victory for San Juan. Where no party gives the Department a plausible reason to believe that it has a material advantage on a specific criterion, we think that ordinarily the Department can ignore that criterion.

■ The Department's concern for market structure has two separate facets: intergateway competition (competition

among airlines at different U.S. gateways serving a common foreign destination) and intragateway competition (competition among carriers on the particular route). *See* NPRM, 50 Fed.Reg. at 38,456; Policy Statement, 51 Fed.Reg. at 43,186–87. We may at the outset put aside the first. Horizon never raised the issue in its brief or submissions to the Department below, concentrating solely on intragateway competition. Brief of Horizon Air Industries in *Seattle–Vancouver Service Case, reprinted in* J.A. at 87 (quoting definition of intragateway competition in the Policy Statement, 51 Fed.Reg. at 43,187). Because Horizon failed to raise this issue with the Department, it is barred by statute from raising it here. 49 U.S.C. § 1486(e) (1982) (court may not review objection to order of the Department unless the objection was raised with the Department); *Air Line Pilots Association v. DOT*, 838 F.2d 563, 567 (D.C.Cir.1988); *Air Line Pilots Association v. CAB*, 502 F.2d 453, 457 (D.C.Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 (1975).

As to intragateway competition, Horizon contends first that the Department "passed up the opportunity to increase the number of competitors serving [Vancouver] from the Seattle gateway." Horizon Brief at 28. The argument is based on the quite shaky assumption that San Juan would go on blithely providing one-stop service from Seattle to Vancouver in the face of competition from two non-stop commuter carriers and two non-stop jet carriers. Before its interment in 1985 the CAB consistently operated under the opposite—and we think more plausible—assumption that carriers offering one-stop service have great difficulty competing with non-stop carriers on the same route. *See, e.g., California–Alberta Route Proceeding*, 76 C.A.B. 824, 828 (1978). In short, Horizon's argument here was not so colorably powerful as to require explicit Department analysis.

■ Horizon also points to a "code sharing" agreement entered into by San Juan and United shortly before San Juan's selection. *See Seattle–Vancouver Service Case*, Dkt. No. 44716, Order 87–10–10 (Oc-

tober 7, 1987) ("Reconsideration Order"), *reprinted in* J.A. at 35. Under the agreement San Juan will be identified by United's two-letter code in the *Official Airline Guide* and in computer reservation systems, and United may hold itself out as providing service wherever San Juan flies. But San Juan will remain an independently owned and operated airline with a separate identity, and will retain sole authority to set its schedules and fares; the agreement gives United neither a financial interest in San Juan nor any control over the smaller airline's operations. *See* Reconsideration Order, J.A. at 35, 37.

The agreement originally covered all of San Juan's operations, but the Department (at Horizon's urging) conditioned its route award on San Juan's agreement not to share United's code in the Seattle–Vancouver market. Reconsideration Order, J.A. at 40. This at least partly met Horizon's contention that the agreement would temper San Juan's willingness to compete aggressively with United on the Seattle–Vancouver route. Moreover, though the Department faulted San Juan for not bringing the agreement to its attention, *id.* at 39 n. 11, it concluded that the agreement as modified would have few anticompetitive effects, *id.* at 3–6, and would not undercut the basis for choosing San Juan over Horizon, *id.* at 4. Note that the Department did expressly consider this issue, so it cannot be faulted for giving it the silent treatment.

Horizon argues, however, that even the residue of the agreement will dampen San Juan's competitive ardor in the Seattle–Vancouver market. But the Department reasoned that commuter service in small, plodding prop-driven planes would not in any event impose a severe competitive constraint on pricing or service by jet setters United and Pacific Western. *Id.* at 39–40. This judgment, in the area of the Department's expertise, is plausible enough to require our deference.

III. ROUTE INTEGRATION

■ Horizon provided service between the gateway (Seattle) and Portland and Eugene, and proposed that its service on the

contested route should (at least in part) take the form of single-plane extension of that service. This led the Department in its original decision to find its proposed route integration "clearly superior." Show Cause Order, J.A. at 25. In the Final Order, however, DOT concluded that Horizon's superior behind service was outweighed by San Juan's edge in market identity and flight frequency. Final Order, J.A. at 29. Horizon attacks this flip-flop, arguing essentially that DOT should have accorded Horizon's advantage in route integration nearly-dispositive weight. Horizon Brief at 30–38.

In its Final Order the Department noted that San Juan's one-stop Portland–Bellingham–Vancouver service (inaugurated after it submitted its original proposal) somewhat offset Horizon's advantage. J.A. at 31. Even so, the Department candidly recognized that Horizon's proposed behind service to Portland remained superior. *Id.* at 30. But it placed less emphasis on the advantage than it originally had because it recognized that the vast majority of Seattle–Vancouver passengers would either be purely local travellers or passengers connecting with flights to or from cities other than Portland—evidently about 90 percent. *See* Final Order, J.A. at 31 n. 6. It reasoned that San Juan's more frequent flights would benefit *both* connecting passengers and the substantial number of local passengers, whereas Horizon's behind service to Portland would benefit a much smaller percentage of the market. *Id.* at 31. This was a reasonable judgment for the Department to make in its role as a surrogate for individual consumers expressing preferences through a market.

## IV. LATE SUBMISSIONS BY SAN JUAN

■ Horizon argues that the Department erred by permitting San Juan to update the record at two points in the proceedings. Horizon Brief at 38–42. First, following the submission of service proposals by both airlines, San Juan revised its proposal to reflect its initiation of one-stop service between Portland and Vancouver and its agreement to purchase two new 19–seat aircraft. J.A. at 81. Second, in response to the Show Cause Order, San Juan gave further details of its interline agreements with other carriers. J.A. at 113–14.[3]

The Department suggests that all the new data is quite trivial. Respondent's Brief at 48. We cannot accept this view. In its Final Order the Department explicitly considered San Juan's new Portland–Bellingham–Vancouver service as material on the route integration issue, J.A. at 31, and indeed the information closely parallels data that the CAB had refused to consider simply because of the applicant's delay in bringing it to the Board's attention, *see United States–Brazil/Argentina All–Cargo Exemption*, 96 C.A.B. 75, 79 n. 9 (1982) (refusing to consider applicant's single-plane behind service).

Nonetheless, we find no error. The Department has not bound itself to act as a procedural martinet, enforcing every procedural nicety to the letter. Thus it is free to be informal, so long as it does not trench on parties' opportunities to be heard fairly. Although the Department conceded that the revisions were somewhat out of the ordinary, Show Cause Order, J.A. at 25 n. 18; Final Order, J.A. at 33 n. 12, it concluded that in "non-oral evidentiary proceedings involving smaller carriers" it was appropriate to "afford parties greater latitude," *id.* It avoided any prejudice to Horizon by giving it an opportunity to respond. Horizon seized the chance on both points, *see* J.A. at 165–66 (Horizon's letter responding to San Juan's revised proposal); J.A. at 122–31 (Horizon's brief in reply to San Juan's response to the Show Cause Order), and the Department considered the responses in its orders. *See, e.g.,* Show

---

3. Contrary to Horizon's assertion, San Juan had notified the Department of its practice of adding extra sections at peak periods in its initial brief *prior* to the *Show Cause Order. See* Brief of San Juan Airlines in *Seattle–Vancouver Service Case,* J.A. at 103. San Juan had also informed the Department that it planned to use 19–seat Dornier aircraft prior to the *Show Cause Order. See* J.A. at 81.

Cause Order, J.A. at 19 n. 3, 25 n. 18; Final Order, J.A. at 28 & n. 2, 33 n. 12.

\* \* \* \* \* \*

Finding no error, we deny the petition for review.