USAIR, INC., Petitioner,

v.

DEPARTMENT OF
TRANSPORTATION, Respondent,

American Airlines, Inc., Georgia and
Atlanta Parties, Delta Air Lines,
Inc., Intervenors.

COUNTY OF ALLEGHENY, PENNSYL-
VANIA, and Greater Pittsburgh In-
ternational Airport, Petitioners,

v.

DEPARTMENT OF
TRANSPORTATION, Respondent,

American Airlines, Inc., Georgia and
Atlanta Parties, Delta Air Lines,
Inc., Intervenors.

Nos. 91–1252, 91–1265.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 7, 1992.

Decided July 24, 1992.

Judith Richards Hope, with whom Mark
L. Gerchick, Randall M. Stone, and James
T. Lloyd, for USAir, Inc., Bruce D. Ryan,
Washington, D.C., and Joseph E. Schmitz,
Washington, D.C., for County of Alleghe-
ny, Pa., and the Greater Pittsburgh Inter-
national Airport, were on the joint brief,
for petitioners in both cases.

Thomas L. Ray, Senior Trial Atty., with whom Paul M. Geier, Asst. Gen. Counsel, and Alexander J. Millard, Trial Atty., Dept. of Transp., and James F. Rill, Asst. Atty. Gen., John J. Powers, III and David Seidman, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondent in both cases.

Carl B. Nelson, Jr. for American Airlines, Inc., Bill Alberger for Georgia and Atlanta Parties, and Robert E. Cohn, Nathaniel P. Breed, Jr., Washington, D.C., and Don M. Adams, Atlanta, Ga., for Delta Air Lines, Inc., were on the joint brief for intervenors in both cases.

Before: SILBERMAN, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

USAir and parties representing the Pittsburgh community and airport petition for review of a Department of Transportation (DOT) award of an international air route between Manchester, England, and a "gateway" city in the United States. The Department granted the route to Delta, flying out of Atlanta, rather than USAir, which proposed operations from Pittsburgh. Petitioners claim that the DOT exceeded statutory time limits in reviewing its Administrative Law Judge's decision recommending that the route be granted to USAir, that an Assistant Secretary illegally influenced the Department's decision, and that the Department arbitrarily placed undue emphasis on the geographic benefits of Delta's proposed service. We deny the petitions.

## I.

After the governments of the United Kingdom and the United States agreed to permit U.S. airlines to fly two new routes between U.S. cities and a regional (other than London) English city, the Department promptly invited carriers to apply. Eight airlines did, all proposing service to Manchester, England, but from different U.S. gateways. The proposals included: TWA, American, and Pan Am from New York, USAir from Pittsburgh, and Delta from Atlanta. By Department order of July 26, 1990 (the Instituting Order), the competing proposals were put before a Departmental Administrative Law Judge (ALJ) for hearing. The ALJ was directed pursuant to section 302.1753 of the Department's procedural regulations, 14 C.F.R. § 302.1753(a), to serve his recommended decision by December 14, 1990.

The ALJ Decision, released to the parties on December 18, 1990,[1] essentially divided the case into two parts, deciding first that one gateway should be New York and that TWA should be the carrier flying from that gateway to Manchester. That first award is not at issue in these petitions, but it should be noted that on the day the ALJ Decision was released, TWA asked to withdraw its application, having agreed to sell its U.S.–London routes to American (which was awarded the New York–Manchester route in the remainder of the proceedings). The Department's Public Counsel[2] thereupon moved, supported "reluctantly" by USAir, to extend the deadline for filings seeking to support or oppose the recommended decision. The Department granted the motion, noting that the "action will not extend the statutory deadline for a [final] decision beyond April 1, 1991."

More directly relevant to our case, the ALJ recommended that the second route should be granted to USAir out of Pittsburgh, although he recognized that USAir and Delta's proposals, measured against each other, created "practically a dead heat." Both Delta and the Public Counsel argued that there was great demand in the Manchester area for flights to the "southern tier" of U.S. states, and especially Flor-

---

1. In late October, the Department had extended the December 14 deadline to December 21, pursuant to 49 U.S.C. app. § 1371(c)(4). That extension is not challenged here.

2. The Public Counsel is an office in the Department that advocates the public interest in DOT adversarial proceedings. It is organizationally segregated from the staff that participates in the decisionmaking process in such cases.

ida (Disney's Magic Kingdom in Orlando apparently being a vacation hotspot for Manchesterians). They claimed that Delta's service through Atlanta would provide more "geographic balance" to the existing Manchester gateways of New York and Chicago. But the ALJ discounted somewhat this supposed advantage, and valued instead the "intergateway competition" that Pittsburgh would afford to New York and Chicago. The judge also emphasized that USAir had fewer international routes than Delta and that Pittsburgh, unlike Atlanta, had no nonstop service to the U.K.

Under the Department's regulations governing international route award cases—cases once the province of the now-defunct Civil Aeronautics Board (CAB)—an ALJ's recommended decision is transmitted not to a political appointee but rather to a senior career official (SCO), who acts as the "DOT decisionmaker" authorized to issue the Department's final decision. *See* 14 C.F.R. § 302.22a(a), (b). The Draft Order of the SCO in this case, Deputy Assistant Secretary for Policy and International Affairs Patrick Murphy, Jr., agreed with the ALJ that the disputed route should be awarded to USAir. Murphy did, however, give greater credit to Delta for geographic balance of service, based largely on Delta's superior marketing plan for the Florida market, and he also downgraded USAir's credit for intergateway competition, deciding that both Atlanta and Pittsburgh could compete effectively with Chicago. But the SCO still thought the benefits of Pittsburgh/New York competition and the enhancing of USAir's "international presence" outweighed Delta's claim. He described the balance as "extremely close"; indeed, it would appear that he thought the ALJ's "dead heat" even closer (which may approach the metaphysical).

The Draft Order then passed to the SCO's superior, the Assistant Secretary for Policy and International Affairs, who on March 18, 1991, published a Notice of Review and Order on Remand (Remand Order). The Assistant Secretary asked the SCO to "review the balance of public benefits as between [the USAir and Delta] proposals." First, noting that the Southeast is

the single largest region for U.S.–Manchester traffic but is comparatively underserved (the only other authorized gateways, New York and Chicago, primarily serve the Northeast and Midwest regions), he suggested that the applicant offering the best service to the South should have a "significant advantage." Second, observing that neither Delta nor USAir operated a Manchester route, and that both carriers' presence in the overall U.S.–U.K. market was limited, he questioned whether it was appropriate to assign much weight to USAir on those scores. Third, the Assistant Secretary questioned the importance of intergateway competition between Pittsburgh and New York, since the majority of Manchester–New York passengers would be "local traffic" for whom no non-New York gateway could realistically compete. Although the Order asked that these matters be "reassessed," it stated that the "decision to remand [the SCO's] opinion should not be interpreted as mandating a particular result. Consistent with the Department's procedural rules, we have reached no judgment as to whether Delta or USAir should receive a primary award in this case."

Murphy, on remand, reexamined the record and reversed his position. *United States–United Kingdom Regional Airport Service Proceeding*, DOT Order 91-4-45 (Apr. 1, 1991) (Final Order). He reduced the weight accorded USAir for intergateway competition and international presence and increased the credit given Delta for geographic balance of service. *See id.* at 19–24. The SCO then concluded that the scales, while still "very close," tipped toward Delta. *Id.* at 25. These petitions followed.

## II.

The petitioners present two procedural arguments and one classic Administrative Procedure Act (APA) challenge on arbitrary and capricious grounds. The two procedural claims apparently are the more attractive to petitioners because they promise more satisfactory relief. If the Department exceeded the statutory period for re-

view of the ALJ Decision, the ALJ's opinion is reinstated and that is the end of the matter. And if the Assistant Secretary violated the Department's regulations by directing the outcome in the case, a court might properly reinstate the SCO's first decision. If we agreed with the petitioners' standard administrative law claim, however, we would only remand—with perhaps less effect on the ultimate outcome than the Assistant Secretary's remand.

### A.

Section 401(c) of the Federal Aviation Act, 49 U.S.C. app. § 1371(c), establishes rather strict time limits for DOT action in carrier selection cases. *See Continental Airlines, Inc. v. DOT,* 856 F.2d 209, 216 (D.C.Cir.1988). When the Department chooses to hold a public hearing on international route applications, the ALJ's recommended decision "shall be issued" no more than 150 days after the order initiating the hearing, and the Department must make its final order in the case "[n]ot later than ninety days after the ... recommended decision is issued." 49 U.S.C. app. § 1371(c)(2). If the Department does not act within the 90–day period, the ALJ's decision becomes the DOT final order in the case. *See id.* § 1371(c)(2)(A).[3]

The Department has sought to gain a bit of decisional breathing room through a regulation, 14 C.F.R. § 302.1753, that obliges the ALJ to "adopt and serve" a recommended decision within 136 days of the order setting the hearing. *Id.* § 302.-1753(a). The ALJ's decision is not, according to the regulation, deemed "issued" until 14 days later. *Id.* § 302.1753(c). Parties must file any exceptions to the decision, *see id.* § 302.1754(a), and briefs in support or opposition thereof, *see id.* § 302.1755(a), in that two week period, allowing, then, the Department a full 90 days to ponder the ALJ's recommendation complete with the parties' submissions. *See id.* § 302.1757(a).

---

**3.** The DOT final order is then forwarded to the President, *see* 49 U.S.C. app. § 1371(c)(2)(B), who may disapprove international certificates

Petitioners challenge the regulation as an impermissible interpretation of the statute. The ALJ's decision, it is argued, was "issued," within the meaning of the legislation, when it was sent to the parties and made public on December 18, 1990. If petitioners are correct, it follows that the statutory deadline for Departmental action fell 90 days later on March 18, 1991, the very day the Assistant Secretary decided to remand the SCO's Draft Order rather than to make it a final decision by affirming it. On that date, by this logic, the ALJ's recommended decision, with its award to USAir, became the Department's final order by operation of law.

■ We need not decide the merits of this issue because, as the DOT protests, the argument was not presented to the Department and is thus not properly before us. Section 1006(e) of the Act provides that "[n]o objection to an order of the [DOT] shall be considered by the court unless such objection shall have been urged before the [DOT] or, if it was not so urged, unless there were reasonable grounds for failure to do so." 49 U.S.C. app. § 1486(e). We have interpreted this codification of the administrative exhaustion doctrine strictly. *See, e.g., Continental Air Lines, Inc. v. DOT,* 843 F.2d 1444, 1455–56 (D.C.Cir. 1988).

Petitioners argue that, notwithstanding section 1006(e), we must entertain the timeliness argument because it is addressed to the agency's "power or jurisdiction" to act and presents an issue "solely ... of statutory interpretation" and thus amenable to judicial review without an administrative record. They rely on *Railroad Yardmasters of Am. v. Harris,* 721 F.2d 1332, 1338 (D.C.Cir.1983). We have, however, subsequently interpreted *Yardmasters* narrowly, as limited to challenges to an agency's very "constitution." *Natural Resources Defense Council v. Thomas,* 805 F.2d 410, 428 & n. 29 (D.C.Cir.1986). (In *Yardmasters* the claim was that the National Mediation Board had no power to act at a time but only on foreign policy or national defense grounds, not on the basis of economic or carrier selection considerations, *see id.* § 1461(a).

when the three member board had two vacancies.) We recently explained that permitting a petitioner to bring a statutory challenge to an agency's action directly to this court "would infringe on agencies' rightful role in statutory construction under the *Chevron* framework." *Linemaster Switch Corp. v. EPA*, 938 F.2d 1299, 1308–09 (D.C.Cir.1991); *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

Petitioners fall back to the alternative excuse referred to in the statutory exhaustion language of section 1006(e), arguing that there were "reasonable grounds" for their failure to raise the timeliness issue below since the Department did not, even in their view, violate section 401(C) until the 90 days had passed. At that point, petitioners contend, there was no opportunity to present the claim except in a petition for reconsideration, which section 1006(e) does not require,[4] and it is unclear whether the Department could at that stage have done anything to "cure" its alleged misdeed. This argument is not insubstantial, but we nevertheless reject it. Petitioners, experienced in these matters, were undoubtedly aware of the time schedule set forth in the Department's regulation,[5] and even if they had not been before this case, the Initiating Order specifically called attention to that regulation.[6] Moreover, in requests to extend the deadlines for lodging exceptions and briefs in light of TWA's withdrawal in late December 1990—that is, during the precise period that USAir was preparing its responses to the ALJ Decision—both the Public Counsel and Delta specifically referred to the statutory deadline in the case as April 1, 1991, as did the Department in approving the motion. Despite its recognition that "statutory time constraints exist," USAir "reluctantly" acceded to the motion, not disputing the other parties' or the Department's position. And in a mid-January filing, USAir referred to April 1 as the date beyond which DOT final action should not be delayed, without any mention of an earlier statutory deadline.

It is true, as petitioners argue, that one could not know for certain that the Department would pass what the petitioners claim was the statutory deadline until the DOT did so, but the Department was openly and repeatedly asserting its interpretation of the statute. Under those circumstances, we think the petitioners were obliged to protest to the Department and bring their statutory timeliness claim up then. The Department could have, by expediting the decision, avoided petitioners' claim. It is even conceivable that the Department might have agreed with petitioners.[7] *See Continental Air Lines*, 843 F.2d at 1456. We recognize that petitioners had little incentive to raise the issue until it became apparent that they had lost, but litigants must not be encouraged to "sandbag" agencies by withholding legal arguments for tactical reasons until they reach the courts of appeal. *See Air Line Pilots Ass'n Int'l v. CAB*, 502 F.2d 453, 457 (D.C.Cir.1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 652 (1975).

### B.

Petitioners' second procedural argument is directed at the Assistant Secre-

---

4. The DOT regulations allow for such a petition; *see* 14 C.F.R. § 302.22a(b)(2), but § 1006(e)—unlike other statutory exhaustion provisions, *see, e.g.*, 16 U.S.C. § 825*l*(b) (FERC)—does not require one. *See Outland v. CAB*, 284 F.2d 224, 227 (D.C.Cir.1960); *see also* 5 U.S.C. § 704.

5. Indeed, the intervenors argue that petitioners waived this challenge to the regulation by failing to petition for review of the rule when it was promulgated in 1985. *See* 49 U.S.C. app. § 1486(a) (petitions must be filed within 60 days of disputed DOT action). But that argument is meritless: petitioners could challenge the regulation at the time it was applied to them. *See, e.g., NLRB Union v. FLRA*, 834 F.2d 191, 195–96 (D.C.Cir.1987).

6. There was an indication of problems with the deadlines from the beginning: the Instituting Order set a 141–day (December 14) deadline for an ALJ decision rather than the 136–day limit provided for in 14 C.F.R. § 302.1753(a). But USAir said nary a word about this apparent error—until its appellate brief.

7. That is not to suggest that we think the petitioners' argument on the merits is a winner.

tary's Remand Order which, it is asserted, virtually compelled the SCO to change his position and therefore violated Department regulation 14 C.F.R. § 302.22a. This regulation, adopted at the time the CAB was abolished and its responsibilities for international carrier selection transferred to the DOT, creates a so-called "insulated decisionmaking process" by which the SCO is given authority to make the Department's "final" decision on route awards. *See* Transfer of Civil Aeronautics Board Functions to DOT; Procedural Regulations, Final Rule, 50 Fed.Reg. 2374, 2375 (1985). This device was apparently chosen in response to a certain unease expressed by commentators, including some members of Congress, at the transfer of this function from a multi-member independent regulatory agency to an executive department. *Id.; see also* H.R.REP. No. 793, 98th Cong., 2d Sess. 8–9 (1984), U.S.Code Cong. & Admin.News 1984, p. 2857. But—and it is a very big but—under the regulation the Assistant Secretary retains authority to review the SCO's decision and to remand it for reconsideration (or affirm it *in toto* ). *See* 14 C.F.R. § 302.22a(b)(3); Final Rule, 50 Fed.Reg. at 2375. The remand order must be "without specific recommendation ... for final action," but it is to include "a full explanation of the basis for remand." *Id.* Petitioners claim that the Remand Order here, although it "does not, on its face, *explicitly* and specifically command the SCO to reverse his decision in favor of USAir," functioned as what they call the "practical equivalent of a dispositive order"—particularly in light of the Assistant Secretary's general supervisory role over his deputy. (emphasis in original).

The government again points out that this issue was not raised below in accordance with § 1006(e), to which petitioners respond that it was not analytically possible to raise the issue until the SCO assimilated the concerns expressed in the Remand Order and reversed his position. It seems to us that petitioners are caught between the proverbial "rock and a hard place." If the Remand Order exceeded the Assistant Secretary's authority under the regulation by directing a reversal (whether *in hoc verbe* or by necessary implication), petitioners could have, and probably should have, cried foul immediately and challenged the legality of the Remand Order even before the SCO responded two weeks later. If, on the other hand, the alleged error was not apparent until the SCO issued his decision, it is difficult to see how it can be successfully argued that there was a violation of the "insulated decision process" regulation.

Petitioners, doubtless aware of their analytical difficulty, seek to straddle the two positions. They do not quite argue that the Remand Order was facially improper. Petitioners would have us infer that, considering all the circumstances, the SCO's reversal was somehow the product of improper influence and was thus in violation of the regulation. We think not.

The regulation limits the Assistant Secretary's review authority *"only* by the requirement that the case may not be reversed." Final Rule, 50 Fed.Reg. at 2375 (emphasis added). He may remand on "any lawful grounds"—broadly defined to include "failure to base a decision upon substantial evidence, failure to adhere to Department policy and precedent, erroneous interpretation of law or regulation and any other prejudicial error"—*id.*, and the SCO is then specifically obligated to take "further action consistent with such order of remand." 14 C.F.R. § 302.22a(b)(3). In this case, the Assistant Secretary, questioning the weight the SCO had accorded several selection criteria, remanded the Draft Order with an explanation of the transportation policies underlying his concerns, *e.g.*, the relative importance of the public benefits resulting from geographically balanced service in light of the limited number of U.S.–Manchester routes and the large amount of traffic to the underserved southern region. The SCO then reassessed the several criteria, as was his duty under the regulation, and concluded that the extremely close balance now tipped toward Delta/Atlanta. He was clearly influenced by the Remand Order, but he did not suggest that he was obligated to reach that conclusion; he could legally have reaffirmed the

selection of USAir after providing a more suitable explanation for it. Indeed, the Remand Order expressly stated that it was *not* intended to displace the SCO's ultimate authority, and explained that the "decision to remand . . . should not be interpreted as mandating a particular result." And there is nothing in the SCO's Final Order or in any other portion of the record that indicates to the contrary.

Petitioners' argument implicitly suggests that the "insulated decisionmaking" set forth in the regulation, insofar as it allows a supervisor to remand a decision to an immediate inferior, but not explicitly reverse, is something of a charade. The procedure does have an artificial quality, but that does not make it illegal. So long as a remand order does not purport to direct the result and there is no indication that the SCO understood that he was *compelled* to reverse his decision, we do not see how a court could question his or the Assistant Secretary's *bona fides. See Horizon Air Indus. v. DOT*, 850 F.2d 775, 779 (D.C.Cir. 1988); *see also United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

## C.

■ Petitioners' substantive claim is that the Department's Final Order placed unexplained, unprecedented, and determinative importance on the "independent" selection criterion of "geographic diversity" in deciding to award the route to Delta flying out of Atlanta. That is to say, in past cases, according to USAir, the Department has employed a set of criteria, established in a policy statement, *see* Procedures and Criteria for Selecting Carriers for Limited–Entry Markets, Policy Statement, 51 Fed.Reg.

43,180 (1986), which does not explicitly include geographic balance.[8] Petitioners have a point; the Department has not routinely included geographic balance as one of the prime selection considerations. But as the Final Order explains, "[i]n both the *U.S.–Australia Service Proceeding* [DOT Order 89–10–2 at 18 (Sept. 25, 1989) ] and the *U.S.–Japan Gateways Case* [DOT Order 86–10–16 at 17–18 (Sept. 16, 1986) ], the Department gave decisional emphasis to the public benefits afforded through the award of new [international] service to underserved regions of the country." Final Order at 23.

Petitioners are correct in asserting that in those cases the Department chose between service to an underserved region versus an additional route to a heavily served *gateway*, whereas here the choice is between an underserved region and an already served *region*, but the principle appears sufficiently analogous to permit the Department reasonably to rely on those decisions as precedents—especially as petitioners have not called our attention to any precedent to the contrary.[9] *See also U.S.–London Gateways Case*, DOT Order 87–5–5 (Apr. 22, 1987), *on reconsideration*, DOT Order 87–6–10 (June 5, 1987) (awarding two new routes largely to achieve greater *regional* balance); *cf. New Gateways to Brazil Case*, 92 C.A.B. 545, note 11 (1981) ("The [Civil Aeronautics] Board has expressed its objective of distributing gateway service in order to achieve greater geographic balance. . . ." (citing cases)).

Geographic balance, moreover, is not a factor foreign to the criteria traditionally employed by the Department. Geographic considerations are intertwined, for example, with market structure (as an element

---

**8.** The five "major" selection criteria are market structure (including inter- and intragateway competition), route integration (the ability to provide benefits to passengers outside of the primary market by flowing traffic over the primary route to and from points behind the gateway), fare and service proposals, incumbency, and ability to enter a market quickly. Policy Statement, 51 Fed.Reg. at 43,186–87.

**9.** Petitioners contend that the DOT treated geographic balance differently in a *later* proceed-

ing. *See U.S.–Italy Service Proceeding*, DOT Order 92–3–48 at 17–18 & n. 33 (Feb. 22, 1992). As the intervenors point out, however, a subsequent agency decision "cannot retroactively invalidate a decision that was sound when made." *Altamont Gas Transmission Co. v. FERC*, 965 F.2d 1098, 1102 (D.C.Cir. June 9, 1992) (citing cases). Thus, although the *Italy* decision does not appear inconsistent with the case at hand, we need not decide the question.

of intergateway competition), route integration (as a key to service behind the gateway), and fare and service proposals (as a qualitative service benefit). It is proposed service, after all, that is the essential focus of the Department's inquiry in these cases, and the Department in the case at bar did not consider Delta's proposal in terms unrelated to the actual service to be provided customers. The DOT did not merely scatter pins around a map (to use petitioners' metaphor), but rather considered geographic balance in the context of discussing the carriers' "service benefits" and "behind-the-gateway" proposals. Final Order at 21–23; *see Australia*, DOT Order 89–10–2 at 18.

Nor can we say that geographic diversity was afforded decisive weight in a way—ignoring all other competing factors—that could be thought arbitrary and capricious. It will be recalled that both the ALJ and the SCO (at least initially), who would have granted the route to USAir, thought the case terribly close. Of course, the Remand Order, which emphasized geographic balance and de-emphasized intergateway competition and international presence, led the SCO to tip the balance against USAir. It is impossible, however, to conclude on this record that the Department gave arbitrary weight to those factors. *Cf. Horizon Air Indus.*, 850 F.2d at 781 (not unreasonable for final order to downgrade, based on reanalysis of record evidence, advantage accorded in original decision).

Our review of agency decisions based on multi-factor balancing tests, when all the factors are legitimate, is necessarily quite limited. We may not merely substitute the balance we would strike for that the agency reached. And it is quite difficult analytically to find the point on the balance where one factor might be thought to have been unreasonably weighted. Multi-factor tests, to be sure, typically give little guidance to future litigants and as a corollary impose limited restraint on agencies—which is perhaps why agencies (and some judges) like them. DOT has, in this regard, chosen to continue the CAB's "unstructured practice of 'varying the weight accorded each criterion from case to case,

depending on the particular circumstances of each proceeding.'" *Id.* at 779 (quoting Policy Statement, 51 Fed.Reg. at 43,186). That approach may well present a "moving target" for judicial review, but nonetheless "the selection of an awardee from among several qualified applicants is basically a matter of judgment, often difficult and delicate, entrusted by Congress to the administrative agency." *Delta Air Lines, Inc. v. CAB*, 564 F.2d 592, 597 (D.C.Cir.1977).

\* \* \* \* \* \*

For the reasons given, the petitions for review are denied.

*So ordered.*