**In re Joseph D. MORRISSEY.**

**No. CRIM. 3:97MS16.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 24, 1998.

Everett G. Allen, Robert L. Harris, Jr., Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, VA, for John D. Morrissey.

David Novak, Assistant United States Attorney, Office of the United States Attorney, Richmond, VA, for United States.

## MEMORANDUM OPINION

PAYNE, District Judge.

The defendant, Joseph D. Morrissey, a member of the bar of Virginia and the bar of this Court, stands convicted of two counts of contempt of court which were instituted by show cause orders on February 12, 1997 and April 9, 1997, respectively. In each show cause order, Morrissey was directed to show cause why he should not be found guilty of criminal contempt for willfully, intentionally, and contumaciously violating Local Criminal Rule 57(C) of the United States District Court for the Eastern District of Virginia ("Local Rule 57(C)"). The charges were tried to the Court sitting without a jury. The findings of conviction were fully docu-

mented on the record on October 31, 1997[1] and are incorporated by reference herein.

Before trial, Morrissey moved to dismiss the show cause orders on the ground that Local Rule 57(C) violated the right of free speech secured to him by the First Amendment. For the reasons set forth below, the Court holds that Local Rule 57(C) does not offend the First Amendment and denies the motion to dismiss the contempt charges.

## I. THE LOCAL RULE

In relevant part, Local Rule 57 provides:

(A) **Potential or Imminent Criminal Litigation:** In connection with pending or imminent criminal litigation with which a lawyer or a law firm is associated, it is the duty of that lawyer or firm not to release or authorize the release of information or opinion (1) if a reasonable person would expect such information or opinion to be further disseminated by any means of public communication, and (2) if there is a reasonable likelihood that such dissemination would interfere with a fair trial or otherwise prejudice the due administration of justice.

\*　　\*　　\*　　\*　　\*　　\*

(C) **Pending Criminal Proceedings—Specific Topics:** From the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the termination of trial or disposition without trial, a lawyer or a law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be further disseminated by any means of public communication, if such statement concerns:

 (1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the lawyer or law firm may make a factual statement of the ac-

cused's name, age, residence, occupation, and family status and, if the accused has not been apprehended, a lawyer associated with the prosecution may release any information necessary to aid in his or her apprehension or to warn the public of any dangers such person may present;

 (2) The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement;

 (3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;

 (4) The identity, testimony, or credibility of prospective witnesses, except that the lawyer or law firm may announce the identity of the victim if the announcement is not otherwise prohibited by law;

 (5) The possibility of a plea of guilty to the offense charged or a lesser offense;

 (6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case.

\*　　\*　　\*　　\*　　\*　　\*

(D) **Pending Criminal Proceedings—General:** During a jury trial of any criminal matter, including the period of selection of the jury, no lawyer or law firm associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview relating to the trial or the parties or issues in the trial, which a reasonable person would expect to be disseminated by means of public communication, if there is a reasonable likelihood that such dissemination will interfere with a fair trial, except that the lawyer or law firm may quote from or refer without comment to public records of the Court in the case.

---

1. The trial of the contempt charges against Morrissey was delayed with the agreement of all concerned to avoid prejudice in the trial of Morrissey's client, Joel W. Harris, who was under indictment in the criminal case in which Morrissey committed the contempts of which he was convicted.

## II. STATEMENT OF FACTS

The charges in this case have historical antecedents in the state court and, therefore, it is necessary briefly to sketch the background of the state court proceedings which began on January 16, 1997 when Joel W. Harris was indicted by a state grand jury on drug distribution charges. Morrissey almost immediately undertook the defense of Harris in the state case.

Harris was active in state and local politics. Consequently, his indictment for distributing controlled substances spawned substantial attention from the print and broadcast media. It also generated a rather shameless display of lawyer-generated publicity. It is safe to say that the constant flow of media attention created a circus-like atmosphere.

After the state proceedings became heavily laden with well-publicized accusations and counter-charges respecting the political motivations of the participants and of various local law enforcement officials, federal authorities took over the investigation. Thus, by January 21, 1997, a federal investigation of Harris' activities was well-underway and, on that date, Morrissey and Harris met with the lead federal prosecutor, James B. Comey, for a proffer session in which the somewhat broadened range of charges under federal investigation were discussed. Meanwhile, Morrissey continued to investigate and prepare a defense to the still pending state charges.

As part of that preparation, Morrissey, Harris and Morrissey's investigator, James Bates, sought to ascertain the identity of witnesses against Harris by reviewing the state court indictment and the allegations in an affidavit in support of a state search warrant. One of the witnesses identified by this process was John Buerkley, who had testified against Harris before the state grand jury. Bates arranged for Morrissey to interview Buerkley on February 2, 1997. During that interview, which was consensually recorded on videotape, Buerkley recanted some of the testimony he had given to the state grand jury.

Two days later, February 4, Harris was indicted by a federal grand jury on drug distribution charges allegedly involving the exchange of drugs by Harris in return for sexual favors, heterosexual and homosexual. Needless to say, the charges were of great interest to the already rather sensational reporting which now could add a salacious overlay to the coverage of the drug distribution charges against a political figure said to possess significant behind-the-scenes influence in local and state political circles. Indeed, by then even the most poorly informed of the Richmond area populace could discern that any story about the Harris case would attract the attention of a ravenous media which, quite predictably, would thrust the information into broadcast sound bites and newspaper headlines. Morrissey, an experienced criminal trial lawyer, knew full well that any news about his client's case would receive substantial broadcast and print media exposure in the geographic area from which juries for this Court are drawn and in which witnesses in the case resided.

Indeed, because Morrissey had so actively communicated to the press his opinions and theories about the charges against Harris in the state proceedings, Comey provided Morrissey with a copy of Local Rule 57(C) when he delivered the federal indictment to Morrissey on February 4. Comey also reminded Morrissey that the Local Rule prohibited the kind of communication with the press in which Morrissey had engaged in the state case (GX 12).

The next day, February 5, found Harris before a United States Magistrate Judge of this Court for a detention hearing. During the course of that proceeding, Morrissey expressed awareness that Buerkley was a potential witness in the federal case against him. Also, on February 5, Augustus S. Hydrick, Jr., counsel for Buerkley, confirmed to Morrissey that Buerkley would be a witness in the federal case.

On February 7, the state prosecutor filed a motion to nolle prosse all state charges against Harris. On February 10, the motion was granted. Nonetheless, Morrissey attempted to schedule hearings in state court on a motion seeking return of some of Har-

ris' seized property. However, the state judge declined to set a hearing on that motion because all state proceedings against Harris had been terminated, thereby depriving the state court of jurisdiction with respect to Harris and the motion to recover the seized property.

On February 10, Comey informed Hydrick that he intended to call Buerkley as a witness in the federal case, notwithstanding the recent recantation by Buerkley of his state grand jury testimony in the videotaped interview with Morrissey. Also, on February 10, Bates attempted to communicate with another witness, Teri Czelusniak, who had been identified by Morrissey, Bates and Harris in their review of the state court indictment and the search warrant affidavit. Czelusniak, however, was disturbed by the efforts of Bates to arrange an interview with Morrissey and informed her counsel, John K. Honey, Jr.

On the morning of February 11, Honey informed Morrissey of Czelusniak's concerns and directed Morrissey to make certain that all communications on this topic were with Honey, not Czelusniak. During that conversation, Morrissey also told Honey that Buerkley would be a witness in the pending proceedings. Although Morrissey did not mention the federal proceedings by name, the federal case was the only one then pending.

During the conversation with Honey on February 11, Morrissey also disclosed that he had convened a press conference for later in the day. Almost immediately thereafter, Honey passed that information along to Comey.

Later, on February 11, between 10:00 and 11:00 a.m., in a telephone conference with Morrissey, Hydrick learned that, at a press conference to be held later that day, Morrissey intended to show the videotape in which Buerkley had recanted part of his testimony before the state grand jury. Hydrick implored Morrissey not to release the videotape to the media because of the adverse effect it likely would have on Buerkley, on his family and on Hydrick's pending negotiations with the federal prosecutors on behalf of Buerkley. Morrissey's investigator, Bates, also asked Morrissey not to release the videotape to the media because to do so would be a breach of faith with Buerkley and would make it difficult, if not impossible, for Bates to arrange access to other witnesses.

Morrissey declined these requests because, as Morrissey put it to Hydrick, release of the videotape to the media was necessary to "send a message to other witnesses." The only persons who, on February 11, qualified as "other witnesses" were those involved in the pending federal case, *United States v. Harris*. Hydrick then passed this information along to Comey, as he continued to negotiate on behalf of Buerkley.

Comey reacted by sending a facsimile letter, asking Morrissey not to hold a press conference, citing Local Rule 57(C), subsections (4) and (6), as the reason. At trial, Comey testified that a principal reason for his entreaty to Morrissey was to forestall problems in jury selection in *United States v. Harris* such as those which had arisen in a recently tried, high profile criminal case, *United States v. Beckford*, wherein it was necessary to excuse almost an entire jury panel because of pretrial publication of the grand jury testimony of a key prosecution witness. In that letter, Comey informed Morrissey that Buerkley was a prospective government witness in *United States v. Harris* and emphasized that Local Rule 57(C) "strictly forbids 'any extrajudicial statement ... if such statement concerns: ... (4) The identity, testimony, or credibility of prospective witnesses ... [or] (6) Any opinion as to ... the merits of the case or the evidence in the case.'" (GX 14).

Before Morrissey replied to Comey, he presented Buerkley's recantation testimony at a press conference at 3:00 p.m. and distributed the press release on that subject. Part of the press conference, some of Buerkley's testimony, and part of the press release appeared on the evening television news and in the next day's edition of the newspaper. Both the broadcast and print media are published in the geographic area from which jurors in this Court are selected and in which witnesses in Harris' case resided.

Shortly after the press conference, Morrissey 'replied to Comey's letter by facsimile. Notwithstanding that the state case had been dismissed and that the state judge had declared the matter ended, Morrissey, in that letter, defended his decision to release Buerkley's testimony to the media and to go forward with the press release and the press conference by stating that they concerned "only the Commonwealth of Virginia's case against Mr. Harris and the tainting of witness [sic] brought before the [state] Multi-jurisdictional grand jury." And, in remarkable disregard of the undeniable truth that, (1) at the February 5 detention hearing in *United States v. Harris,* Morrissey himself had described Buerkley as a government witness and (2) that Comey's letter describes Buerkley as a "potential government witness," Morrissey told Comey that "I have not commented on any witnesses known to be called in the [sic] Mr. Harris' federal trial nor do I intend to ." (GX 15). All the while, as evidenced by the press release which accompanied that statement, Morrissey already had released to the media the videotape of Buerkley's interview with Morrissey.

Morrissey's reply to Comey also acknowledged that he had reviewed Local Rule 57(C). In implied support of his decision to release, and comment upon, Buerkley's testimony, Morrissey informed Comey that: "I have also discussed said rule [Local Rule 57(C)] with three former prosecutors."

Morrissey's discussions with others can hardly be said to lend support to his decision to release, and comment upon, Buerkley's testimony. For example, one former prosecutor, Michael Morchower, testified that he had not even spoken with Morrissey until after the press conference and then had expressed no opinion on the subject. Morrissey also talked with Murray Janus who, although having no prosecutorial background, is an experienced lawyer specializing in the defense of criminal cases. Not long before the press conference, Janus told Morrissey, not that playing the tape was permissible, but that: "It sounds like a close call. Think

it through and go slow. It looks like they may be trying to set you up." The third person, Raymond B. Carpenter, a respected former federal prosecutor and defense lawyer, specifically told Morrissey in the early afternoon of February 11: "Joe, you've got a problem with Local Rule 57." Morrissey's response to that remark was to hang up on Carpenter without pursuing the issue further.

After receiving Comey's February 11 letter, Morrissey also discussed the question with four lawyers in his office, Messrs. Massie, Muzi, Maloney and Hershner. All, but Muzi (who had served as an intern in a state prosecutor's office), were equivocal in their comments. Muzi thought there was "no problem with Rule 57."

According to Bates, Morrissey released Buerkley's videotaped testimony to the media to shake other witnesses, or, as Morrissey put it to Bates, to "rock their world." Morrissey testified at trial that his motive for releasing the testimony was to induce other witnesses to come forward. That, of course, is exactly the opposite result which was apprehended by Bates, Morrissey's investigator, when he asked Morrissey not to release the videotape to the media. The record leaves no doubt that one of Morrissey's motives was to rattle the witnesses and thereby to affect the testimony they would give. Another motive was to level the playing field with respect to publicity about Harris and the case.[2]

On February 12, the Honorable James R. Spencer, the presiding judge in *United States v. Harris,* issued Show Cause Order No. 1, pursuant to 18 U.S.C. § 401(3). It charged Morrissey with:

> willfully, intentionally and contumaciously violating Local Criminal Rule 57(C) ... by holding a press conference to discuss a prospective government witness, by distributing a press release concerning the same witness, and by displaying and distributing a videotaped statement by that witness in which the witness allegedly disavowed incriminating information supplied

**2.** That was an admitted motive in the publicity war waged by Morrissey while the state court proceedings were pending. It is fair to infer that

a similar motive attended the comments Morrissey gave in the federal case.

to the government concerning Mr. Morrissey's client, Joel Walker Harris.

On February 19, Judge Spencer set the trial of *United States v. Harris* for April 2. At that hearing Judge Spencer stated:

> Let me say this, since we may not have a face-to-face on Friday. Mr. Harris has been charged with some relatively serious offenses, and if he is found guilty, the sentences are such that his life can be destroyed. It is obviously an important matter to him. And it is my job to see that Mr. Harris gets a fair trial. And that's why we have the rules that we have and that's why I filed this order to show cause. Because there is some indication that the rules may have been violated. I want it understood here on out that this case will not be tried in the media. It will be tried in this Court. And any infractions of that admonition will be met with a harsh result. Thank you very much.

GX 21.

On March 4, 1997, a superseding indictment was issued in *United States v. Harris* and Judge Spencer set the trial for April 14, 1997. On April 1, 1997, a second superseding indictment was issued. On that date, Morrissey gave an interview to a newspaper reporter. The newspaper article is GX 23. The parties have stipulated that the article accurately recites the statements therein attributed to Morrissey. In that article, Morrissey said that "the charges [against Harris] never should have been filed" and that "if the charges had come up when he [Morrissey] headed the [state] prosecutor's office, we would have laughed it out of court." At trial, these were found to be comments on the merits of the case.

On April 9, 1997, Show Cause Order No. 2 was issued. It charged Morrissey with "willfully, intentionally and contumaciously violating Local Rule 57(C) ... by his comments on April 1, 1997 to reporters ... about the merits of the prosecution of *United States v. Harris*."

It is in this factual context that Morrissey's First Amendment rights allegedly were infringed by the institution of charges for violation of Local Rule 57(C). And, it is in this actual context that Morrissey's challenge to the application of that rule to his speech must be assessed.

## III. DISCUSSION

Morrissey's challenge to Local Rule 57(C) is that its strictures on a lawyer's freedom of speech are not sufficiently narrow to pass scrutiny under the First Amendment as interpreted in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). In particular, Morrissey asserts that, under *Gentile*, a speech-restricting rule of the sort here at issue can pass constitutional muster only if it prohibits lawyer comments to the press that present a "substantial likelihood of materially prejudicing an adjudicative proceeding" (the "substantial likelihood standard"). Put another way, Morrissey argues that Local Rule 57(C) is constitutionally defective because it prohibits dissemination of lawyers' statements "if there is a reasonable likelihood that such dissemination would interfere with a fair trial or otherwise prejudice the due administration of justice" (the "reasonable likelihood standard").

As a threshold matter, the United States argues that Morrissey has waived any right to challenge the constitutionality of the rule. On the merits, the United States asserts that Local Rule 57(C) is constitutionally adequate.

### A. The Waiver Argument

 Morrissey agreed to abide by Local Rule 57(C) when he was admitted to practice in this Court in 1987, and again in 1996, when he was readmitted to practice in this Court following his reinstatement to practice upon completion of the period of suspension of his law license imposed by the state.[3] Those agreements, argues the United States, constitute the waiver of any right Morrissey

---

**3.** Under the Local Rules, suspension of a lawyer's license to practice by the state automatically results in withdrawal of the privilege to practice in this Court. Morrissey's license to practice was suspended by Virginia on November 7, 1994 and his privilege to practice in this Court was withdrawn until Morrissey's state suspension was completed on May 7, 1996. He was readmitted to practice in this Court on May 21, 1996.

may have had to challenge the constitutionality of the rule.

In support of its position, the United States relies upon *Wilkinson v. Legal Services Corp.*, 80 F.3d 535 (D.C.Cir.1996), wherein the District of Columbia Circuit applied classic principles of equitable estoppel to preclude an agency employee from challenging, as constitutionally impermissible, the composition of the management board of his employing agency. The rationale for the decision was that the appellant had been employed and compensated for almost two years by the very management group which he alleged to have been unconstitutionally appointed. *See also Robertson v. FEC*, 45 F.3d 486 (D.C.Cir.1995) (precluding, by equitable estoppel, a constitutional challenge to the composition of the Federal Election Commission by a presidential candidate who had accepted funds from the FEC).

Morrissey's agreements to abide by the Local Rules do not equate to an estoppel of the sort at issue in *Wilkinson* or *Robertson*, on which *Wilkinson* was based. Moreover, it is settled that a lawyer may challenge the constitutionality of a rule in a proceeding to determine whether he has violated it. *See In re Oliver*, 452 F.2d 111 (7th Cir.1971).[4]

### B. The Constitutional Challenge to Local Rule 57(C)

■ Local Rule 57(C) is substantially identical to Disciplinary Rule 7–107(B) ("DR 7–107(B)"), the constitutionality of which was measured by the Fourth Circuit in *Hirschkop v. Snead*, 594 F.2d 356 (4th Cir.1979). In *Hirschkop*, a lawyer brought a declaratory judgment to void the adoption of DR 7–107(B) by the Supreme Court of Virginia on the ground that the rule unconstitutionally restricted lawyers' comments about pending litigation in violation of the First and Fourteenth Amendments.

The Fourth Circuit began its analysis of the constitutional issue by explaining that "[s]tate and federal courts have a substantial interest in assuring every person the right to a fair trial, a right which the Supreme Court has described as 'the most fundamental of all freedoms,'" and that this right could often be impaired by "lawyers' unrestrained, prejudicial comment pending trial." 594 F.2d at 363–64 (citations omitted). Upon that reasoning, the Fourth Circuit held that DR 7–107(B) furthered "'an important or substantial governmental interest unrelated to the suppression of expression,'" thereby satisfying the first part of the test set by *Procunier v. Martinez* for assessing the constitutionality of governmental restrictions on speech. *Hirschkop*, 594 F.2d at 363–64 (*quoting Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)).

The Court of Appeals then turned its attention to the second aspect of the test in *Procunier*: whether the restrictions imposed by DR 7–107(B) were unnecessarily broad, or whether a less intrusive means of assuring the fundamental right to a fair trial was adequate. *Id.* at 364–65.[5] Like Local Rule 57(C), the rule in *Hirschkop* contained six enumerated topics as to which extrajudicial statements were expressly prohibited during the pendency of criminal proceedings. And, like Local Rule 57(C), DR 7–107(B) did not, in the subsection setting forth the six categories of restricted speech, expressly articulate a standard against which to measure whether the making of statements on those six specific topics was permissible.

After observing that the "express provisions of the rule [DR 7–107(B)] are not explicitly qualified," the Court of Appeals concluded that "[s]ince ... one may imagine some situations which ought not to result in the filing of charges, some qualification is necessary." *Id.* at 367–68. The constitutionally requisite qualifications were located by

---

4. The same is not true of an order, however. *United States v. Cutler*, 58 F.3d 825 (2d Cir.1995) (applying the collateral bar doctrine to preclude a constitutional challenge to a gag order). This case does not involve such an order.

5. Having surveyed the history of earlier disciplinary rules regulating extrajudicial comments by lawyers, the Fourth Circuit explained that the

express prohibitions in DR 7–107(B) on six categories of speech were a replacement for more vague and generalized rules which had not provided adequate guidance to lawyers respecting the kinds of extrajudicial statements which were prejudicial to the integrity and fairness of judicial proceedings. *Id.* at 365–67.

examining the rule as a whole. In that respect, the Fourth Circuit held that:

> It is obvious from a reading of the *entire rule* that the drafters were *concerned with speech for publication which had a reasonable likelihood of interference with a fair trial.* It does not strain the language of the rule to treat that *qualification* as *implicit in each of the [six] categories.*

*Id.* at 368 (emphasis added).

Having determined that each of the six express prohibitions of DR 7–107(B) was qualified by the "reasonable likelihood of interference with a fair trial" standard, the Court of Appeals then considered whether the standard was sufficiently protective of lawyer speech to satisfy the First Amendment. On that critical point, the Court of Appeals held that:

> If some qualification of expressed prohibitions is necessary, however, we find no basis for a conclusion that the Constitution of the United States requires a tighter standard than that implicit in the rules themselves. The only reason for any qualification at all is to take care of the unusual case in which, because of extraordinary circumstances, there is no likelihood of a prejudicial effect.... Thus, we are not certain that any clear and present danger or serious and immediate harm test would be met, and we see no reason for injecting into the rules the uncertainties which the imposition of one or both of those standards would occasion....

*Id.* at 368. Moreover, the Court held that one of the virtues of the rules was that:

> They tell the lawyers what they may publicize as well as what they may not. *With the reasonable likelihood of interference qualification, the rules seem to be as definite as any set of rules may be.* The clarity of their guidance is marked. But the injection of any other standard would make the prohibition, which is now clear and definite, to some extent unclear and gray. The reason for the injection of any

qualification at all does not require that result as a matter of constitutional doctrine.

*Id.* (emphasis added).

Finally, the Fourth Circuit held that "[n]o heavier or stiffer standard than the reasonable likelihood test is needed to protect [lawyers] from disciplinary sanctions for speech for publication without adequate notice of the consequences." *Id.* at 369. Thereupon, the Court of Appeals rejected the challenge to DR 7–107(B) as applied to criminal jury proceedings.

Fourteen years after *Hirschkop,* the Supreme Court of the United States considered the constitutionality of a disciplinary rule which barred lawyers from making extrajudicial statements that would have a "substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1060, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). The rule in *Gentile,* unlike Local Rule 57(C), did not set forth explicit prohibitions on certain categories of speech, but instead listed, in an advisory fashion, categories of statements which would likely have such a prejudicial effect, and which thus would be in violation of the disciplinary rule.

The decision in *Gentile,* of course, must be considered in perspective of the issues presented to the Supreme Court for decision. The lawyer insisted that rules, such as Local Rule 57(C), restricting lawyer speech must conform to the demanding standard set in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) for suppressing press commentary on evidence during pending criminal proceedings.[6] The Nevada rule, applying the "substantial likelihood of material prejudice" standard, set far less demanding standards for regulating lawyer speech. The Supreme Court declined to apply to the speech of lawyers the extremely strict test it had set for regulating comments by the press. In so holding, Chief Justice Rehnquist explained that:

**6.** In *Nebraska Press Ass'n,* the Court held that to "suppress press commentary on evidentiary matters, the State would have to show that 'further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found

> who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court.'" *Gentile,* 501 U.S. at 1065 (*quoting Nebraska Press Ass'n,* 427 U.S. at 569).

Lawyers representing clients in pending cases are key participants in the criminal justice system, and the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct. . . . Because lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative.

*Gentile,* 501 U.S. at 1074.

The Chief Justice also emphasized that: "[f]ew, if any interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile,* 501 U.S. at 1075. Then, the Chief Justice particularized the high cost to society occasioned by abridgement of the right to a fair trial by an impartial jury when extrajudicial lawyer comments exceeded appropriate bounds. The articulated toll included the need for new trials, for change of venue, for extensive voir dire examination, and the fact that extensive jury examination of change of venue often could not cure the damage caused by extrajudicial statements of lawyers. *Id.* Consequently, "[t]he State has a substantial interest in preventing officers of the court, such as lawyers, from imposing such costs on the judicial system and the litigants." *Id.*

■ As *Gentile* makes clear, the limitations imposed by speech-restrictive rules, such as Local Rule 57(C), aimed at achieving that end are directed to "two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found." *Gentile,* 501 U.S. at 1075. And, in achieving those objectives, all speech-restrictive rules must be "narrowly tailored" so as to avoid an impermissible intrusion on the First Amendment rights of lawyers. *Id.* The Nevada rule under consideration in *Gentile* was found to be narrowly limited because it only applied to speech that was substantially likely to have a materially prejudicial effect, it was neutral as to points of view, it applied equally to all attorneys participating in a pending case, and it merely postponed the attorneys' comments until after the trial. *Id.* at 1076.

It is true, as Morrissey argues, that the plurality opinion, authored by the Chief Justice, held that the " 'substantial likelihood of material prejudice' standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials." *Gentile,* 501 U.S. at 1075.[7] And, it is correct that Justice O'Connor, who joined the opinion on this issue in a separate concurrence, similarly concluded that the " 'substantial likelihood of material prejudice' standard . . . passes constitutional muster.' " *Gentile,* 501 U.S. at 1082.

However, Morrissey is incorrect in asserting that *Gentile* means that the only constitutionally acceptable standard is the one reflected in the Nevada rule and approved in *Gentile.* To the contrary, *Gentile* did not evaluate the constitutional adequacy of the other standards of which the Court took note, including the reasonable likelihood standard in DR 7–107(B) which, as the Court stated, was then in effect in 11 states. *See*

**7.** Justice Kennedy delivered the opinion of the Court with respect to the petitioner's "void for vagueness" challenge to a safety valve provision of the Nevada disciplinary rule. Although Morrissey's brief makes passing reference to the void for vagueness part of *Gentile,* it does so only in discussing the standard. Morrissey's constitutional challenge to Local Rule 57(C) is not predicated on the void for vagueness aspect of *Gentile.* Such a challenge, of course, would be ineffective because of the difference in the two rules.

Justice Kennedy also issued an opinion addressing the constitutionality of the "substantial likelihood of material prejudice" standard, in which three other justices joined. Justice Kennedy commented that although the current case was a "poor vehicle for defining with precision the outer limits under the Constitution of a court's ability to regulate an attorney's statements about ongoing adjudicative proceedings," at the very least, the rule under consideration represented. "a limitation of First Amendment freedoms greater than is necessary or essential to the protection of the particular governmental interest, and does not protect against a danger of the necessary gravity, imminence or likelihood." *Id.* at 1057–58.

*Gentile,* 501 U.S. at 1068. Nor is Morrissey's interpretation of *Gentile* proved by the comment in *Gentile* that the reasonable likelihood standard is "less protective of attorney speech" than is the Nevada rule. *Id.* Morrissey's position fails ultimately because it ignores the rationale which *Gentile* employed to evaluate restrictions on extrajudicial lawyer statements during the pendency of criminal proceedings. When measured against the reasoning upon which *Gentile* was decided, Local Rule 57(C) also passes constitutional muster.

First, *Gentile* teaches that rules restricting lawyer speech must only "impose narrow and necessary limitations on lawyers' speech." *Gentile,* 501 U.S. at 1075. The restrictions here at issue are both narrow and necessary. This is underscored by the fact that the six categories of prohibited speech in Local Rule 57(C) closely track a similar list given by the Supreme Court of the United States as speech that likely will cause prejudice in an adjudicative proceeding. *See Gentile,* 501 U.S. at 1076; *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). For instance, in *Sheppard,* the Supreme Court held that the trial court could have taken preemptive action to prevent the resulting prejudice to the defendant's trial by:

> proscrib[ing] extrajudicial statements by any *lawyer,* party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation to take any lie detector tests; any statement made by Sheppard to officials; *the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence;* or *like statements concerning the merits* of the case.

384 U.S. at 361 (emphasis added). The underscored text, of course, is substantially identical to that in subsections (4) and (6) of Local Rule 57(C).

Second, the limitations on lawyer speech must be aimed at the principal evils which threaten the integrity and fairness of the judicial system. *Gentile,* 501 U.S. at 1075. Two of those evils are lawyers': "(1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire even if an untainted panel can be found." *Id.* Here, Morrissey was cited for speech which went to two of those six topics: the identity, testimony or credibility of a witness (and one whom Morrissey himself considered to be a key witness in the pending case), and the expression of a lawyer in the case about the merits of the case. It is beyond serious question that comments of that sort "are likely to influence the actual outcome of the trial" and "are likely to prejudice the jury venire, even if an untainted panel can ultimately be found." *Gentile,* 501 U.S. at 1075.

Third, speech restrictions which prevent lawyers, as officers of the courts, from imposing on the judicial system and the litigants the unacceptable costs outlined in *Gentile* are permissible only if they are "narrowly tailored to achieve those objectives." *Id.*[8] Narrow tailoring must include provisions which render the rule neutral as to points of view, which make the rule apply equally to all attorneys practicing in a pending case, and which merely postpone lawyer comments until after the trial. Local Rule 57(C), like the rule under scrutiny in *Gentile,* satisfies each of those benchmarks of constitutionally adequate protection.

Moreover, Local Rule 57(C) is actually more narrowly drawn than the Nevada rule because the rule here identifies six specific topics, themselves rather limited, as to which the proscription against lawyer speech attaches. And, the reasonable likelihood limitation applies to each of these six specific proscriptions as if it were articulated in each of them. *Hirschkop,* 594 F.2d at 367–68. The speech prohibited by the Nevada rule was defined only as that which "the lawyer knows or reasonably should know ... will have a substantial likelihood of materially

---

8. See supra pp. 538–539. The objectives to be achieved are the avoidance of the costs of changing venue, extraordinary voir dire procedures, the difficulty of seating an impartial jury even after probing voir dire, and the inherent prejudicial difficulty in disinfecting criminal trials of the substance of extrajudicial statements. *Gentile,* 501 U.S. at 1075–76 (*citing Sheppard v. Maxwell,* 384 U.S. 333, 350–51, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Turner v. Louisiana,* 379 U.S. 466, 473, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)).

prejudicing an adjudicative proceedings." The Nevada rule also provided an advisory list of speech which might offend the substantial likelihood standard, but the rule left the ultimate assessment on that point to the subjective judgment of the lawyer.

Unlike the rule in *Gentile*, Local Rule 57(C) provides lawyers with explicit and fully adequate notice of the kind of speech which is proscribed. As to each proscribed topic, the reasonable likelihood of prejudice standard ensures that lawyers are not sanctionable for technical violations of the rule in which there is no likelihood of prejudicial effect. *Hirschkop*, 594 F.2d at 368. Taken together, the express specification of proscribed topics and the reasonable likelihood standard afford a constitutionally adequate level of protection for lawyer speech respecting pending criminal proceedings.

In sum, Local Rule 57(C)(4) and (6) impose restraints on lawyer speech that are narrowly tailored to achieve precisely the objectives to which the Supreme Court in *Gentile* held that such restrictions properly may be directed. Moreover, Local Rule 57(C) explicitly prohibits extrajudicial statements which have long been recognized as presenting the greatest risk of prejudice in an adjudicative proceeding, and only sanctions those statements which are reasonably likely to have that effect. Hence, like the rule at issue in *Gentile*, Local Rule 57(C) strikes a permissible balance between (1) the societal interest in upholding the fundamental right of the litigants to an impartial jury and to a fairly conducted adjudicative proceeding, and (2) the free speech rights of lawyers who are operating within the system whose central tenet is the fundamental right those restrictions are designed to achieve.

The Fourth Circuit has not spoken on the subject since *Hirschkop*. There is scant authority on this issue in other circuits since *Gentile* was decided. However, four years after *Gentile*, the Second Circuit considered the constitutionality of the "reasonable likelihood of prejudice" standard as applied to an attorney disciplinary rule in *United States v. Cutler*, 58 F.3d 825 (2d Cir.1995). In *Cutler*, the court addressed the constitutionality of a local disciplinary rule similar to Local Rule

57(C) which: (1) prohibited speech "if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice," and (2) then enumerated several specific categories of forbidden speech without repeating the "reasonable likelihood" standard.

The Second Circuit cited *Hirschkop* as interpreting rules of that sort (such as DR 7–107, the rule in *Hirschkop*) so that speech in each of the six prohibited categories was restricted only if it met the "reasonable likelihood standard" because the court saw "no need to adopt an interpretation of [the local rule] that might offend the Constitution." *Cutler*, 58 F.3d at 835. Although the Second Circuit noted *Gentile*, it did not discuss the Supreme Court's reference to the "reasonable likelihood" standard as one less protective than the "substantial likelihood of material prejudice" standard at issue in *Gentile*, nor did the Second Circuit consider the "reasonable likelihood" standard to be constitutionally infirm. *See Cutler*, 58 F.3d at 836–37. Hence, *Cutler* instructs that *Hirschkop* is consistent with *Gentile* and with the interpretation of Local Rule 57(C) as a constitutionally adequate restriction of lawyer speech in pending criminal cases.

## IV. CONCLUSION

With knowledge of Local Rule 57(C), Morrissey willfully, deliberately, and contumaciously violated it on February 11. In the same frame of mind, he did so again on April 1 after having received one citation for contempt and after having been admonished by a judge of this Court to act in conformity with Local Rule 57(C) and not to try the case in the press.

The rule in its entirety, and the two parts of it which Morrissey violated, are intended to secure a fair trial by an impartial jury. The comments by Morrissey clearly fall within the definition of the principal evils sought to be avoided by speech-restrictive rules because it was reasonably likely that the comments would influence the outcome of the trial and prejudice the venire, even if an untainted panel could be found. The restric-

tions imposed by Local Rule 57(C) are both necessary and narrow in scope.

For the reasons explained above, the reasonable likelihood of interference with a fair trial standard passes constitutional muster. Accordingly, the Motion to Dismiss the Show Cause Orders is DENIED.

The Clerk is directed to send a final copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

It is so ORDERED.