Marion G. ROBERTSON and Americans for Robertson, Inc., Petitioners,

v.

FEDERAL ELECTION COMMISSION, Respondent.

No. 93–1698.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1994.

Decided Feb. 3, 1995.

Carol A. Laham, Washington, DC, argued the cause, for petitioners. With her on the briefs were Jan Witold Baran and Thomas W. Kirby, Washington, DC.

Richard B. Bader, Associate Gen. Counsel, Washington, DC, argued the cause, for respondent. With him on the brief were Lawrence M. Noble, Gen. Counsel, and Vivien Clair, Atty., Federal Election Com'n., Washington, DC.

Before: SILBERMAN, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Marion G. (Pat) Robertson and Americans for Robertson, Inc. (collectively referred to as "petitioner"), seek review of a determination of the Federal Election Commission that petitioner must repay certain campaign matching funds. We reject petitioner's constitutional and statutory challenges, but grant the petition with respect to one of four disputed expense items.

## I.

 Petitioner made an unsuccessful bid for the Republican Party's nomination for election as President in 1988. During the course of the primary campaign, Robertson was eligible for and received campaign matching funds under the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 (1988). Robertson remained eligible to receive such funds from the beginning of the primary season until April 28, 1988.[1] He received funds thereafter only in conjunction with "winding down" expenses "associated with the termination of political activity" (*e.g.*, administrative costs, expenses in fundraising to assist in retiring campaign debt). 11 C.F.R. § 9034.4(a)(3)(i) (1994). He was given a total of $10,410,-984.83 in public funds. A candidate who receives matching funds under the statute is obliged to maintain and provide documentation to the Commission verifying that all expenses are "qualified" campaign expenditures and that those expenditures fall within Commission limits. Any expenditure in excess of the individual state or overall limits or not properly documented is deemed a "nonqualified" campaign expense, and the FEC may seek a *pro rata* repayment (determined by a multiplier) of the share of public funds attributable to such nonqualified expenditures. *Id.* §§ 9035.1, 9038.2.[2]

Following petitioner's campaign, the Commission audited petitioner's campaign expenditures and his receipt and use of public funds.[3] 26 U.S.C. § 9038(a); 11 C.F.R. § 9038.1(a)(1). Discovering irregularities in recordkeeping, disbursements, and expenditure levels, the Commission on December 19, 1989 issued an "Interim (preliminary) Audit Report" and "preliminary calculation" whereby petitioner was thought to be obliged to repay $290,772.60. Petitioner subsequently sought to convince the FEC as to the propriety of its expenditures, but on March 26, 1992, the Commission issued a "Final Audit Report" and "initial repayment determination" of $388,543.78; in addition, the FEC asserted that petitioner should refund $105,-634.56 to certain press organizations that had allegedly overpaid for the cost of air travel with petitioner's entourage. Petitioner again responded in writing, on June 25, 1992, and also requested an oral presentation before the Commission. He made the presentation

---

1. The Commission determined that petitioner's final date of eligibility for receipt of public funds was April 28, 1988, based upon petitioner's successive poor showings in primary races, *see* 26 U.S.C. § 9033(c)(1)(B).

2. 2 U.S.C. § 441a(b)(1)(A) establishes per state and overall expenditure limitations for presidential primary candidates who receive public campaign funds. Expenses are allocable generally to the state where "... incurred ... for the purpose of influencing the nomination with respect to

that particular state," as determined by the Commission's regulations. 11 C.F.R. § 106.2. *See generally id.* Pt. 106.

3. The GOP nominated George Bush on August 18, 1988, triggering the three-year period prescribed by statute for the Commission to "notify" any candidate of a repayment obligation the Commission "determines" the candidate owes and which "the candidate shall pay to the Secretary." 26 U.S.C. § 9038(b), (c) (1988).

on December 2, 1992, and submitted supplemental documents on December 9, 1992.

The Commission thereafter (in September 1993) released its "final determination" accompanied by a "Statement of Reasons" concluding that petitioner was obliged to repay $290,793.66 to the United States Treasury.[4] The repayment figure reflected disallowances for, *inter alia,* the four insufficiently documented, excessive or otherwise not "qualified" campaign expenses which are the subject of this appeal. These four disputed repayment items include amounts that petitioner claims the Commission had either improperly allocated to or wrongly judged to have exceeded the Iowa and New Hampshire state expenditure limits; funds that had been transferred between petitioner's national and state campaign accounts; and monies that had been spent attending the 1988 Republican National Convention.

In addition to disputing these assessments, petitioner, at the oral hearing, also challenged the Commission's authority to issue *any* repayment determination. Petitioner contended that the Commission had failed to meet the statutory three-year period for "notification" of repayment determinations, *see* 26 U.S.C. § 9038(c), a period which ran from August 18, 1988 (the date of the GOP nomination of George Bush) to August 18, 1991. The FEC (Commissioner Elliott dissenting) rejected this argument as not properly presented to the Commission since it had only first been made at the oral hearing. Pursuant to FEC regulations, oral presentations to the Commission may only deal with matters raised in prior written submissions, 11 C.F.R. § 9038.2(c)(3), which are themselves due within 30 days of the issuance of the Final Audit Report (although an extension to 45 days was granted here). *See* 11 C.F.R. § 9038.2(c)(2). Petitioner did not raise the issue of the three-year limit on "notification" of repayment determinations in compliance with the Commission's internal procedures for challenging agency action.

## II.

■ Petitioner, before us, presents an array of objections to the Commission's order of repayment, ranging from a challenge to the constitutionality of the FEC's composition to a claim that the Commission's actions exceeded its statutory authority to a dispute as to the merits of four separate expense items. The constitutional challenge is based on the presence of two congressionally appointed, non-voting *ex officio* members on the Commission throughout the proceedings in this case. We have recently held that the Commission so composed is unconstitutional. *See Federal Election Comm'n v. NRA Political Victory Fund,* 6 F.3d 821, 826–27 (D.C.Cir.1993), *cert. granted,* — U.S. —, 114 S.Ct. 2703, 129 L.Ed.2d 832 (1994), *cert. dismissed,* — U.S. —, 115 S.Ct. 537, 130 L.Ed.2d 439 (1995).[5] The Commission, however, in an effort to avoid the effect of our opinion, voted on December 1, 1993, to ratify its past "actions in audits of publicly funded presidential campaigns," including this case, without the presence of the two *ex officio* members. Petitioner disputes the Commission's claim that this action undoes any taint of unconstitutionality.

The Commission's response is that petitioner's constitutional challenge is not properly raised because it was not brought before the Commission. The latter point need not detain us. It was hardly open to the Commission, an administrative agency, to entertain a claim that the statute which created it was in some respect unconstitutional. *See Mitchell v. Christopher,* 996 F.2d 375, 378–79

---

4. The Commission's determination also "ordered" petitioner to refund the $105,634.56 sum attributable to press overpayments. Petitioner has argued that the Commission does not have authority to order such a refund, and the Commission has conceded that any challenge would have to frame petitioner's press charges as impermissible corporate campaign contributions under 2 U.S.C. § 441b (1988), enforceable through the procedures set forth in 2 U.S.C. § 437g (1988). So the issue is not before us.

5. Although it initially granted *certiorari,* the Supreme Court dismissed the FEC's petition on the grounds that since the Commission does not have independent litigating authority to file petitions for *certiorari* before the Court under 2 U.S.C. § 437d(a)(6), the Court lacked jurisdiction to hear the case.

**490**

(D.C.Cir.1993). Still, we do not need to decide whether the FEC's subsequent ratification vote obliterated the unconstitutional taint because petitioner is estopped from challenging the Commission's constitutionality. *See Fahey v. Mallonee,* 332 U.S. 245, 255, 67 S.Ct. 1552, 1556–57, 91 L.Ed. 2030 (1947) (where a party has enjoyed benefits from agency under a statutory scheme, courts will not entertain challenges to agency's existence); *Brockert v. Skornicka,* 711 F.2d 1376, 1380 (7th Cir.1983) (constitutional estoppel "most appropriate when a party seeks to retain the benefits of a governmental act while attempting to invalidate its burdens").

Petitioner, after all, voluntarily accepted over $10 million in public funds disbursed at the Commission's direction. It is hardly open to it now, after having taken the money, to claim that the very statutory instrumentality by which the funds are dispensed may not seek reimbursement because its composition is unconstitutional. Under the statute only the Commission may seek reimbursement (not, for example, the Justice or Treasury Departments), so under petitioner's logic, if it had taken the funds and spent them in a gambling casino, the taxpayers would have no recourse—at least as to compelling repayment.[6]

■ The doctrine of constitutional estoppel, as petitioner points out, has its limits. The government may not interpose the doctrine as a defense if a party wishes to challenge an unconstitutional condition which is imposed on the receipt of federal funds. *See Kadrmas v. Dickinson Pub. Schools,* 487 U.S. 450, 456–57, 108 S.Ct. 2481, 2486–87, 101 L.Ed.2d 399 (1988). But that limitation is not applicable here; rather, petitioner has mounted a categorical, structural challenge unrelated to the funds he has received and now attempts to avoid repaying. Petitioner is claiming, in effect, that the entire process by which it received funds—not the criteria

for eligibility, disbursement, or repayment—is unconstitutional. It would seem that a party wishing to make such a challenge must do so before it accepts and spends federal funds—not after, as a ploy to avoid its part of a bargain.

■ Petitioner's second, statutory argument is more troublesome, however. It is claimed that the Commission's "final determination" came down after the three-year period during which the statute permits the Commission to "notif[y]" the candidate of a repayment "determin[ation]." *See* 26 U.S.C. § 9038(b), (c). The Commission, in accordance with its regulation (adopted before both the end of the three-year period and the Commission's final determination in this case and ostensibly representing a "clarification" of prevailing Commission practice), contends that the statute requires only that the Commission issue its "interim audit report" (preliminary calculation) prior to the expiration of the three-year period; it is not even obliged to issue its initial determination before that point. At oral argument, counsel for the Commission conceded, however, that the Commission would not be entitled to make a "determination" in excess of the amount stated in a preliminary calculation if that higher determination was made after the three-year period expired—which is what happened in this case.[7] It may well be that the Commission's elastic interpretation (whether in its regulations, if deemed "procedural" and therefore not impermissibly retroactive, *see Landgraf v. USI Film Prods.,* —— U.S. ——, ——, 114 S.Ct. 1483, 1502, 128 L.Ed.2d 229 (1994), or in its general practice of interpreting the statute) of the words "notify," "determines," and "determination" stretches *Chevron* deference beyond its reach. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). We conclude, however, that we should not decide this question, ei-

---

6. The statute does provide for criminal penalties for unlawfully misspent funds, granting the Attorney General authority to pursue such wrongdoers and setting penalties. *See* 26 U.S.C. § 9042(b).

7. In petitioner's case, the amount ostensibly owed increased after the preliminary calculation, ultimately declining in the final determination, though still slightly above the preliminary calculation. The second, higher amount was arrived at after the three-year period for agency notification had run.

ther, because the Commission was within its rights in refusing to consider petitioner's statutory argument.

■ An agency is entitled to prescribe its own procedures, including requirements that parties give timely notice as to the nature of any challenges to agency authority, at least as regards actions already taken. *See USAir, Inc. v. Department of Transportation,* 969 F.2d 1256, 1260 (D.C.Cir.1992). Petitioner waited until the oral hearing to indicate its view that the FEC's authority to issue a determination had expired. But the Commission's regulations provide that the oral hearings are confined to matters raised in a timely written submission (filed within 30 days of the final determination), 11 C.F.R. § 9038.2(c)(2), (3) (1994), and petitioner's *written* submission simply did not make this argument even though it was filed on June 25, 1992, long after the August 18, 1991, date that petitioner claims marked the end of the Commission's authority to issue a final determination. Petitioner points out that Commissioners can and. did ask a broad range of questions at the oral hearing and that the FEC allows supporting documents to be submitted up to five days *after* the oral hearing. These practices, petitioner argues, suggest that the content of the original written response is not dispositive or controlling in agency proceedings and that the scope of the Commission's inquiry has in this case been *de facto* expanded (as petitioner's "Supplemental Response" filed in support of its oral presentation thoroughly addressed the statutory issue). That proposition does not logically follow, however; soliciting or accepting additional material *during* or *after* the oral hearing does not *necessarily* expand the subject matter scope of the original written submissions or implicitly relax the agency's procedural requirement for challenges to agency decisions. The regulation thus can be interpreted to limit additional material to the previously raised subjects—which is exactly how the Commission does interpret it.

The Commission's application of its regulation is certainly technical and strict—too technical and strict for the dissenting Commissioner who thought an oral hearing unnecessary under the Commission's reading—

but we cannot conclude that the regulation or the Commission's interpretation is unreasonable. We ourselves, after all, will not permit a party to take a position at oral argument not supported by its principal brief.

### III.

That brings us to the specific expenditures disallowed. It should be noted that under the statute and the FEC's regulations a recipient of campaign funds assumes the burden of documenting expenses attributed to state and national expenditure limits, and of producing those documents at the Commission's request and to the Commission's satisfaction. 11 C.F.R. § 106.2(d). But, of course, the Commission's determination as to what documentation is adequate must pass the Administrative Procedure Act reasonableness test.

■ The FEC had claimed in its *initial* repayment determination that petitioner had significantly exceeded both the Iowa and New Hampshire state expenditure limits, thereby incurring corresponding obligations to repay public matching funds. Petitioner was able to reduce a portion of the claimed excess by producing additional documentation which resulted in cancellation of some expenditures and the reallocation of others to alternative state, regional, or national campaign expense categories. The Commission's final determination, however, rejected petitioner's effort to account for $14,665.50 spent over the Iowa state limit. Petitioner claimed that that amount was never actually expended, because it had been deposited with a telephone company for telephone service in Iowa but was subsequently refunded. The Commission determined that petitioner had inadequately established that the refunded amount was of a deposit that was specifically directed to telephone service allocable to the Iowa state limit, so petitioner was not entitled to that specific credit. (Petitioner had pointed to a handwritten note on the refund check that stated only that the refund was related to phone service originating within an Iowa area code.)

The Commission reasonably concluded that the telephone company refund check—made

**492**

out by the Omaha, Nebraska office of Northwestern Bell and payable to petitioner's office in Bismarck, North Dakota—with only the written notation that it was a refund related to telephone service somehow connected to an Iowa area code was insufficient evidence that the check offset specific Iowa expenditures. The notion of state expenditure limits incorporates specific time frames and accounting methods for attribution of expenses to a given state primary effort. Petitioner's proffered documentation does not meet the FEC's requirements sufficiently to offset Iowa primary expenditures.

■ Petitioner was also accused of insufficiently documenting the ultimate deposit or disbursal of funds on the state level transferred from petitioner's national account to a state campaign account. The transferred funds, in the amount of $17,008.00, were thus not shown to have been spent on qualified campaign expenses. Petitioner's *pro rata* repayment obligation of public funds out of this amount was calculated at $5,189.86. Petitioner argued that the funds had been merely transferred, not expended. The Commission found, however, that petitioner had no supporting documentation for that proposition. We do not think the Commission was arbitrary in insisting on documentation establishing that funds transferred from petitioner's national accounts were actually received and *deposited* in state accounts and not otherwise expended. The Commission's regulations clearly require that such disbursements be accounted for, including proof of transfers and deposits. 11 C.F.R. § 9033.11(c).

■ The Commission also concluded that petitioner had impermissibly utilized matching funds for expenditures—not connected with "winding down" costs—made after petitioner's statutorily-determined viability as a primary candidate had expired. The Commission defines the regulatory term "winding down" as "associated with the termination of political activity." *Id.* § 9034.4(a)(3)(i). Petitioner spent $74,482.01—of which the Commission has now ordered a repayment to the Treasury of $22,727.59—in order to attend and portray his attendance at the 1988 Republican National Convention, which occurred well after petitioner's eligibility for

receipt of public funds had ended. Petitioner claimed that the video and audio record of Robertson's attendance at the convention was utilized as part of a mass mailing to raise funds to retire campaign debts, which should be thought a paradigmatic "winding down" expense.

The Commission had previously reasonably rejected the notion that attendance of a party's convention was a legitimate winding down expense, *see Repayments by Publicly Financed Presidential Candidates*, 50 Fed. Reg. 9,422–23 (March 8, 1985); the making of a video of that event for fundraising purposes understandably did not alter the Commission's conclusion. Under petitioner's theory, a candidate's trip to Hawaii would be a legitimate winding down expense if videos from the trip were used at fundraising gatherings.

■ We do not think, however, that the Commission's rejection of petitioner's claim concerning certain New Hampshire expenditures was reasonable. Petitioner sought to convince the Commission that it had not exceeded the New Hampshire state expenditure limit by showing that the $120,352.47 cost of a fundraising mailing had been incorrectly allocated to that state's limit. The Commission's regulations provide that fundraising expenses are not presumptively deemed allocable to a state expenditure limitation unless incurred *within* 28 days of a particular state's primary election. 11 C.F.R. §§ 100.8(b)(21), 110.8(c)(2).

■ Petitioner, in order to avoid the attribution of the costs of the mailing to the New Hampshire state limit, proved that the postage for the mailing had been purchased by January 15, 1988, at least four days prior to the start of the 28–day period (the primary occurred on February 16), and produced corroborating dated copies of check request forms and an affidavit of a campaign worker verifying that the mailing had actually preceded the period. The Commission rejected this showing in the Statement of Reasons without elaboration. The Commission only acknowledged that it had originally *double counted* the mailing expense; it did not mention the allocation of the cost to the New Hampshire primary effort. The agency

gave no indication of what more it wanted as proof. The FEC's terse explanation did not meet the standard of reasoned agency decisionmaking, *see SEC v. Chenery Corp.*, 318 U.S. 80, 89–90, 95, 63 S.Ct. 454, 460–61, 462–63, 87 L.Ed. 626 (1943), nor do the more elaborate makeweight explanations (*e.g.*, disputing whether a receipt for postage is equivalent to a mailing date) belatedly presented before us alter our conclusion. While recipients of matching funds bear the burden of accounting for, allocation and documentation of campaign expenses, the agency cannot reject uncontroverted documentation relevant to state expenditure limits.

* * *

Accordingly, we deny the petition except as it relates to the New Hampshire expenditures.