# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 27, 2005       Decided March 3, 2006

No. 04-1311

LAROUCHE'S COMMITTEE FOR A NEW BRETTON WOODS,
PETITIONER

v.

FEDERAL ELECTION COMMISSION,
RESPONDENT

———

Petition for Review of an Order of the Federal Election
Commission.

———

*Robert P. Trout*, Washington, D.C., argued the cause for petitioner. With him on the briefs was *John Thorpe Richards, Jr.*, Washington, D.C.

*Colleen T. Sealander*, Associate General Counsel, Federal Election Commission, argued the cause for respondent. With her on the brief were *Lawrence H. Norton*, General Counsel, *Richard B. Bader*, Associate General Counsel, and *Holly J. Baker,* Attorney.

Before: GINSBURG, *Chief Judge*, and HENDERSON and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Petitioner LaRouche's Committee for a New Bretton Woods (the "LaRouche Committee" or "Committee") was the principal campaign committee for Lyndon H. LaRouche Jr.'s bid for the Democratic party presidential nomination in 2000. Pursuant to the Presidential Primary Matching Payment Account Act (the "Act"), *see* 26 U.S.C. § 9033(a)(1)-(3); 11 C.F.R. § 9033.1(b)(3)-(5), the LaRouche Committee received $222,034 in federal matching funds from the Federal Election Commission (the "FEC") in connection with "mark-up charges" paid to vendors affiliated with LaRouche. FEC regulations place upon a campaign that receives federal funds the burden to prove that a challenged payment is a "qualified campaign expense[]." 11 C.F.R. § 9033.11(a). After an audit and hearing, the FEC determined that the LaRouche Committee failed to carry its burden to prove that the mark-up charges were reasonable and ordered the Committee to repay the $222,034. The Committee offered no evidence before the FEC that established either the basis or the reasonableness of the mark-up charges. We conclude, therefore, that the FEC's order to the Committee to repay the matching funds used for the mark-up charges was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), nor "unsupported by substantial evidence." *Id.* § 706(2)(E). We deny the petition for review with respect to the repayment order. The LaRouche Committee also challenges the FEC's denial of its motion for reconsideration of the repayment order. We dismiss this portion of the petition for lack of jurisdiction because the LaRouche Committee's "intent to seek review" cannot "be fairly inferred from the petition for review or from other contemporaneous filings." *Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 313 (D.C. Cir. 2000); *see also* Fed. R. App. P. 15(a)(2)(C).

**I.**

During the 2000 presidential campaign, the LaRouche Committee received $1,448,389 in federal matching funds. The Committee spent the bulk of these funds for advertising and fund-raising services by seven vendors that LaRouche and several of his political associates created in the mid-1980's to provide and distribute material advocating LaRouche's political, philosophical, and scientific views.[1] LaRouche was the vendors' sole client. Some of these vendors had provided services to LaRouche's 1988, 1992, and 1996 presidential campaigns.

There were three components to the LaRouche Committee's payments to the vendors during the 2000 campaign: (1) an amount resulting from an "activity ratio"[2] applied to "baseline costs"[3]; (2) fixed monthly fees ranging from $150 to $750; and (3) a "mark-up" to the "activity ratio" amount.[4] The first two

---

[1] The seven vendors were American System Publications, Inc., Eastern States Distributors, Inc., EIR News Services, Inc., Hamilton Systems Distributors, Inc., Mid-West Circulation Corp., Southeast Literature Sales, Inc., and Southwest Literature Distributors, Inc.

[2] The "activity ratio" attempted to capture the ratio of campaign versus non-campaign activities performed by the vendors on behalf of LaRouche. The LaRouche Committee defined it as "the number of contributions raised for the Committee through use of the [vendors'] facilities [divided] by the total of all sales and contribution transactions for the distribution company."

[3] "Baseline costs" included "vendor costs implicated when volunteers used corporate facilities, (e.g., offices, office equipment, cars, phones, postage) or provided services to further Lyndon LaRouche's presidential campaign."

[4] The mark-up was 80% from July 1997 through September 1999, 50% for the last three months of 1999, and 0% during 2000 (for

components are not at issue here. The mark-up payments are.

The FEC audited the LaRouche Committee following the 2000 campaign and issued a Preliminary Audit Report on July 17, 2002, and a Final Audit Report on May 1, 2003. Both reports found that the mark-ups were not qualified campaign expenses because the "proferred reasons for the mark-up were not supported by the facts." Under the Act, a campaign must return to the U.S. Treasury matching funds that are not spent as qualified campaign expenses. *See* 26 U.S.C. § 9038(b)(1), (2). The FEC auditors ordered the Committee to repay the matching funds used for the mark-ups. On July 8, 2003, the LaRouche Committee requested an administrative review of the Final Audit Report and a hearing before the FEC. During the course of the hearing, held on September 17, 2003, the LaRouche Committee submitted a declaration from William J. Caldwell, a Certified Public Accountant, in an effort to explain the mark-up expenses. In supplemental materials submitted on September 26, 2003, the LaRouche Committee also stated that the mark-ups included: "1) costs not included in the vendors' baseline charges and highly variable costs that were underestimated; 2) compensation for one-time start up costs and intangibles; 3) advance payment/bad debt reserves; and 4) a small profit."

On March 11, 2004, the FEC issued its Repayment Determination and ordered the LaRouche Committee to repay $222,034. The $222,034 figure consisted of (a) $67,988 of public funds used by the LaRouche Committee for payments that were not qualified campaign expenses,[5] and (b) $154,046 in

_____

an average of 32% per year).

[5] Over the course of the 2000 presidential campaign, the Committee overpaid vendors by $241,519. The FEC determined that 28.15% of this overpayment was through public funds. The FEC therefore concluded that the LaRouche Committee owed "a pro-rata

matching funds received in excess of LaRouche's entitlement.[6] Both components of the repayment result from the FEC's determination that the vendor mark-ups were not qualified campaign expenses.

The FEC set forth six factors that influenced its determination: (1) the LaRouche Committee "did not provide any verifiable basis for the mark-up charges it used;" (2) many of the indirect costs cited by the Committee to "justify the mark-up would appear to have already been captured by the activity ratio;" (3) the probability of default was low given the Committee's history with the vendors, a factor that would refute the need for a mark-up charge; (4) the Committee's failure to provide records "to explain and support [its] general categorical descriptions of unidentified and hidden vendor costs;" (5) the Committee's failure "to produce any document by which the [FEC] can either quantify the mark-up charges or determine the reasonableness of . . . mark-up charges proffered;" and (6) the Committee's inability to "justify the original, frontloaded 80%, 50% and 0% mark-up structure."

The Committee petitioned the FEC to reconsider its order on two grounds. First, it contested the FEC's calculation of the amount of the repayment. The FEC granted rehearing on this issue and affirmed its order that the Committee repay $222,034. Second, the Committee sought an adjustment of the repayment

---

repayment of $67,988 ($241,519 x .2815) to the United States Treasury."

[6] Disallowing the mark-up expenses reduced the Committee's net outstanding campaign obligations on October 2, 2000 to $9,226. However, the LaRouche Committee received matching fund payments after October 2, 2000 totaling $163,272. The FEC thus concluded that the LaRouche Committee received $154,046 ($163,272 - $9,266) of public funds in excess of LaRouche's entitlement.

amount based on repayments requested from its vendors in the wake of the FEC's order. The FEC denied reconsideration of this issue. The Committee petitions this Court for review of the FEC's repayment order and the denial of the motion for reconsideration. We deny the petition for review with respect to the repayment order and dismiss, for lack of jurisdiction, the challenge to the FEC's denial of the motion for reconsideration.

## II.

The Presidential Primary Matching Payment Account Act provides partial federal financing for the campaigns of eligible candidates. 26 U.S.C. §§ 9031-9042. Candidates may only use federal funds to defray "qualified campaign expenses,"[7] *id.* § 9042(b), and must repay any funds that the Commission finds were used for another purpose, *id.* § 9038(b)(2). Candidates must prove that the matching funds are spent on "qualified campaign expenses," *id.* § 9033.11(a), and agree in writing to "keep and furnish to the Commission all documentation relating to disbursements and receipts," *id.* § 9033.1(b)(5), as well as any "other information the Commission may request," *id.*

---

[7] 26 U.S.C. § 9032 defines the term "qualified campaign expense" as

> a purchase, payment, distribution, loan, advance, deposit, or gift of money or of anything of value—
>
> > (A) incurred by a candidate, or by his authorized committee, in connection with his campaign for nomination for election, and
> >
> > (B) neither the incurring nor payment of which constitutes a violation of any law of the United States or of the State in which the expense is incurred or paid . . . .

§ 9033.1(b).

The Act requires the Commission to audit every publicly-funded campaign.  26 U.S.C. § 9038(a).  The Commission has adopted detailed procedures for these audits.  After examining a candidate's books, records, and personnel, the FEC issues a Preliminary Audit Report and affords the candidate an opportunity to respond.  *See* 11 C.F.R. § 9038.1(c)(1)-(2).  The Commission then issues a Final Audit Report that contains a repayment determination.  *See id.* § 9038.1(d)(1).  The candidate may seek administrative review.  *See id.* § 9038.2(c)(2).  As part of this review, a candidate may request an oral hearing.  *See id.* § 9038.2(c)(2)(ii).  Following review, the FEC issues a Repayment Determination with a Statement of Reasons.  *See id.* § 9038.2(c)(3).  The candidate may file a petition for rehearing before the FEC, limited to "new questions of law or fact that would materially alter the Commission's . . . repayment determination."  *Id.* § 9038.5(a).  Here, the LaRouche Committee exercised its right to challenge the FEC's determinations during every step of the audit process, including at an oral hearing.

Section 9041 of the Act, 26 U.S.C. § 9041, directs that we review the repayment decisions of the FEC under the arbitrary and capricious standard of the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A); *Comm. to Elect Lyndon La Rouche v. FEC*, 613 F.2d 834, 845-46 (D.C. Cir. 1979).  We must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence."  *Id.* § 706(2)(E).  "Under this highly deferential standard of review, the court presumes the validity of agency action . . . and must affirm unless the [agency] failed to consider relevant factors or made a clear error in judgment."  *Cellco P'ship v. FCC*, 357 F.3d 88,

93-94 (D.C. Cir. 2004) (citation and quotation marks omitted). Our task is limited and familiar. "A court cannot substitute its judgment for that of an agency . . . and must affirm if a rational basis for the agency's decision exists." *Bolden v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201, 205 (D.C. Cir. 1988) (citation omitted).

The Committee argues that the FEC's repayment order was arbitrary and capricious because it failed to credit the uncontested affidavit of an expert that the challenged vendor mark-up expenses were normal and usual charges and failed to acknowledge that the mark-ups were a necessary means to comply with the limitations on corporate campaign contributions imposed by 2 U.S.C. § 441b. We conclude that the Committee's arguments are without merit.

After allowing the LaRouche Committee ample opportunity on three occasions to try to prove the mark-up charges were qualified campaign expenses, the FEC properly found that the LaRouche Committee "failed to produce any document by which the Commission can either quantify the mark-up charges or determine the reasonableness of . . . the . . . mark-up charges proffered by the [LaRouche Committee]." The Committee argues this determination was wrong because it "completely overlooked the expert testimony provided in the Declaration of William J. Caldwell." The Committee asserts that the uncontroverted Caldwell declaration established that the mark-up charges were reasonable.

The record shows, however, that the Commission considered the Caldwell declaration: the FEC's Statement of Reasons specifically recognized that the Committee alleged that a "15% mark-up is standard" and cites the Caldwell declaration as "Attachment 2 at 165-66." Although the Commission did not discuss the declaration in its decision, an agency "is not

obliged to summarize in its decision the contents of all of the documents in the record before it." *SBC Commc'ns Inc. v. FCC*, 56 F.3d 1484, 1492 (D.C. Cir. 1995). The passing reference to the declaration in the Commission's decision is hardly surprising. The declaration is immaterial and unsubstantiated, provides no information about the actual mark-up expenses, and does nothing more than opine that the type of mark-up charged by these LaRouche-affiliated vendors is "reasonable for the market." In reaching this ungrounded conclusion, the declaration fails to provide any supporting evidence or documentation. Mr. Caldwell fails to mention even a single example of a company or firm that collects a similar mark-up. The declaration failed to provide the FEC with "relevant factors" regarding the mark-up charges. *See Cellco P'Ship*, 357 F.3d at 94.

The LaRouche Committee argues that the FEC cannot ignore an "uncontroverted affidavit presented by a campaign," citing *Robertson v. FEC*, 45 F.3d 486 (D.C. Cir. 1995). As we have just shown, the FEC did not ignore the Caldwell declaration. In any event, *Robertson* provides no help to the Committee. In *Robertson,* we overturned an FEC determination because the Commission ignored an affidavit from an affiant who had personal factual knowledge about material events at issue in the case. *Id.* at 492-93. Here, by contrast, Mr. Caldwell's declaration does not provide factual information about which he has first-hand knowledge—rather, it simply contains his general, unsubstantiated, and conclusory opinion that the charged mark-up was reasonable.

The Committee also argues that its payment of the mark-up charges was a qualified campaign expense because it was compelled by § 441b(a) of the Federal Election Campaign Act of 1971 ("Campaign Act"), 2 U.S.C. §§ 431-455, which prohibits corporations from making "a contribution or

expenditure in connection with any [federal] election" and also prohibits "any candidate, political committee, or other person [from] knowingly . . . accept[ing] or receiv[ing] any contribution prohibited by this section." The Campaign Act defines "contribution or expenditure" as "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value . . . to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section." *Id.* § 441b(b)(2). The Committee claims that the mark-ups were simply the vendors' attempt to avoid an underpayment that would violate § 441b.

This argument misses the mark. The FEC has not concluded that mark-up charges can never be qualified campaign expenses. In fact, the Commission expressly recognized that "there are indirect and hidden costs inherent in many commercial transactions, and that vendors may mark-up charges in order to cover such costs and to make a profit." The issue here is not whether mark-up charges may ever be qualified campaign expenses. They may. Rather, the issue here is the Committee's failure to provide the FEC "any verifiable basis for the mark-up charges it used." The Committee did not carry its burden of showing that the FEC has "failed to consider relevant factors or made a clear error in judgment," *see Cellco P'ship,* 357 F.3d at 94, in its determination that the Committee must repay the federal funds spent in connection with the mark-ups. Faced with such a failure, we see nothing that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in the FEC's repayment determination. 5 U.S.C. § 706(2)(A).

Finally, we turn to the Committee's argument that the FEC arbitrarily and capriciously denied its petition for rehearing, which we also reject. Rule 15(a) of the Federal Rules of

Appellate Procedure requires that a petition for review "specify the order or part thereof to be reviewed." Fed. R. App. P. 15(a)(2)(C). "Failure to specify the correct order can result in dismissal of the petition." *Entravision Holdings*, 202 F.3d at 312. "A mistaken or inexact specification of the order to be reviewed will not be fatal to the petition, however, if the petitioner's intent to seek review of a specific order can be fairly inferred from the petition for review or from other contemporaneous filings, and the respondent is not misled by the mistake." *Id.* at 313 (collecting cases).

By its terms, the Committee's petition to this Court sought review only of the repayment order and not of the denial of its motion for reconsideration. Its only mention of the denial of that motion in its petition for review was a passing reference in its recitation of the procedural history of this case: "[the Committee had] filed a timely motion for reconsideration of the March 11, 2004 decision on March 31, 2004, which was denied by the commission in a letter dated August 10, 2004." Referring to the denial without expressly seeking review is inadequate. The "other contemporaneous filings," the Petitioner's Statement of Issues To Be Raised on Appeal and the Docketing Statement, both filed on October 18, 2004, make no reference to the motion for reconsideration. The Petitioner's Statement of Issues To Be Raised on Appeal does not refer to the August 10, 2004 order. The Docketing Statement only lists the March 11, 2004, repayment order under the heading "Rulings Under Review" and, in the space after "Give date(s) of order(s)," states "3/11/04; 8/10/04." Such a passing reference is inadequate. On March 1, 2005, the Committee filed a merits brief with this Court which added–for the first time–the FEC's denial of the petition for rehearing to the list of "Rulings Under Review" and which briefed additional issues related to the petition for rehearing.

We are without jurisdiction to review the FEC's denial of the Committee's motion to reconsider the repayment order because we cannot infer an "intent to seek review" from the insufficient references in the petition for review and docketing statement. *See Entravision Holdings,* 202 F.3d at 312-13; Fed. R. App. P. 15(a)(2)(C). The Committee's late attempt to raise this issue in its merits brief was well past the thirty days allowed for seeking review in this Court. *See* 26 U.S.C. § 9041(a).

## III.

For the foregoing reasons, we deny the petition for review with respect to the repayment order and dismiss, for lack of jurisdiction, the Committee's challenge to the denial of the motion for reconsideration.

*So ordered.*