# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 18, 2023   Decided July 21, 2023

No. 21-1213

JILL L. STEIN, DR. AND JILL STEIN FOR PRESIDENT,
PETITIONERS

v.

FEDERAL ELECTION COMMISSION,
RESPONDENT

On Petition for Review of an Order
of the Federal Election Commission

*Oliver B. Hall* argued the cause and filed the briefs for petitioners.

*Shaina Ward*, Attorney, Federal Election Commission, argued the cause for respondent. With her on the brief were *Kevin Deeley*, Associate General Counsel, and *Jacob S. Siler*, Assistant General Counsel.

Before: HENDERSON, WILKINS, and KATSAS, *Circuit Judges*.

2

Opinion for the Court by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The federal government funds certain expenses incurred by presidential candidates at specific times during their primary campaigns. Jill Stein, who ran for President in 2016, contends that a temporal limit on this funding unconstitutionally discriminates against minor-party candidates. Stein also contests an administrative ruling that she forfeited the right to document certain costs of winding down her campaign, which could have offset a repayment obligation that she owed the government. We deny her petition.

I

A

The Presidential Primary Matching Payment Account Act makes public funds available for the campaigns of presidential primary candidates. 26 U.S.C. §§ 9031–42. Under the Act, candidates may receive funds to match individual contributions up to $250. *Id.* § 9034(a). A candidate may use these funds to defray qualifying expenses incurred in connection with her primary campaign. *Id.* §§ 9032(9), 9038(b). Except for expenses associated with winding down a campaign, these expenses must be incurred during specific times known as the matching payment period. *Id.* §§ 9032(6), 9038(a); 11 C.F.R. § 9034.11(a).

The end of the matching payment period depends on whether the candidate's party selects its nominee at a national convention. If it does, the period ends when a nominee is selected. 26 U.S.C. § 9032(6). If it does not, the period ends on the earlier of that date or the last day of the last national convention held by a major party. *Id.* If a candidate seeks the nomination of both a party that selects its nominee at a national convention and one that does not, the matching payment period ends on the later of the two statutory possibilities. FEC

3

Advisory Op. No. 2000-18 at 3–4 (Aug. 11, 2000). For such candidates, the matching payment period thus ends no later than the end of the national conventions.

The Federal Election Commission must audit every campaign that receives public funds under the Act. 26 U.S.C. § 9038(a). If the audit reveals that the candidate received excess funds or used funds for an unauthorized purpose, the candidate must repay those amounts. *Id.* § 9038(b).

Regulations outline the audit process. After considering materials from its staff and the candidate, the FEC issues an audit report that includes any repayment determination. 11 C.F.R. § 9038.1(d)(1). The candidate may seek administrative review of the determination within 60 days. To do so, she must "submit in writing … legal and factual materials demonstrating that no repayment, or a lesser repayment, is required." *Id.* § 9038.2(c)(2)(i). The "failure to timely raise an issue" in these written materials "will be deemed a waiver of the candidate's right to raise the issue at any future stage of proceedings including any petition for review." *Id.*

B

At its national convention on August 6, 2016, the Green Party nominated Jill Stein for President. But this nomination did not qualify Stein for a spot on many states' general-election ballots. In those states, Stein sought to access the ballot through petition initiatives and by seeking the nomination of individual state parties. Stein pursued these efforts until September 9, 2016, the latest state deadline for her to so qualify. In connection with her primary campaigns and ballot-access efforts, Stein accepted over $590,000 in public funds.

The FEC issued its audit report in April 2019. It determined that Stein owed the government $175,272. This calculation assumed that Stein's matching payment period ended on August 6, 2016, when Stein secured the Green Party

nomination, which was after the two major-party conventions. The calculation also reflected one offset for winding down costs incurred through August 2018 and a second, estimated offset for later winding down costs. The report stated that the estimate "will be compared to actual winding down costs and will be adjusted accordingly." App. 14.

In June 2019, Stein sought administrative review of the repayment determination. As relevant here, she argued that the Fifth Amendment required extending her matching payment period from August 6 to September 9, the last possible date for her to qualify to appear on a state general-election ballot. And she asserted that she would have no repayment obligation if the period were so extended. In a single sentence, Stein also stated that "other findings concerning the nature of winding down expenses … cannot survive scrutiny." App. 26.

After a substantial delay caused by the lack of a quorum, the Commission granted review and set a hearing date in February 2021. A week before the hearing, Stein submitted evidence of winding down costs not previously considered. After the hearing, Stein submitted more such evidence.

In September 2021, the FEC issued its final repayment determination, which again fixed her obligation at $175,272. The agency rejected Stein's arguments for extending the matching payment period. It further held that Stein had forfeited any argument for recognizing additional winding down costs to offset the repayment amount.

Stein sought review in this Court. We have jurisdiction under 26 U.S.C. § 9041.

II

Stein first contends that the Act defines the matching payment period in a way that unconstitutionally discriminates against minor-party candidates. As explained above, the period

ends no later than the end of the national conventions. For major-party candidates, Stein reasons, this cutoff ensures funding until the nominee has secured access to every state's general-election ballot. But no such guarantee protects minor-party candidates who, even if they secure a nomination at a national convention, still must seek ballot access through state-party primary campaigns or petition drives. If those activities extend beyond the national conventions, as happened in 2016, the cutoff prevents minor-party candidates—and only minor-party candidates—from receiving funding for campaign activities necessary to secure access to all states' general-election ballots.

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court considered various equal-protection challenges to the limits on public funding for general and primary campaigns in presidential elections. Under the scheme for general-election campaigns, major-party candidates receive more money than candidates of minor or new parties. *See id.* at 88. The funding distinctions depend on the percentage of the popular vote received by each party in the last election cycle: major parties are those that received at least 25% of the popular vote; minor parties are those that received between 5% and 25%; and new parties are those that received less than 5%. *Id.* at 87. Candidates of new parties receive no public funds unless the candidate wins at least 5% of the popular vote in the election at issue. *See id.* at 89. The challengers objected that this differential treatment unconstitutionally discriminates against minor and new parties, but the Court disagreed. *See id.* at 97.

The Court held that restrictions on public funding are constitutional if they further an important government interest and do not "unfairly or unnecessarily burden[] the political opportunity of any party or candidate." *Buckley¸* 424 U.S. at 95–96. The Court concluded that Congress's "interest in not funding hopeless candidacies with large sums of public

money" is important enough and "necessarily justifies the withholding of public assistance from candidates without significant public support." *Id.* at 96. So too does "the important public interest against providing artificial incentives to splintered parties and unrestrained factionalism." *Id.* (cleaned up). The Court further stressed that the funding scheme does not reduce the strength of nonmajor parties "below that attained without any public financing," for any party remains "free to raise money from private sources." *Id.* at 99. And as for relative burdens, a candidate accepting public funds must agree to expenditure limits that are constraining for major-party candidates but "largely academic" for others. *Id.* Finally, the Court noted that the challenged funding restrictions were less constraining than previously upheld state laws "limiting places on the ballot to those candidates who demonstrate substantial popular support." *Id.* at 96.

The funding limits at issue here easily survive review under these standards. Primary elections, no less than general elections, implicate the important government interests in limiting public funding for candidates with slim support. And the Green Party received only 0.4% of the popular vote in the 2012 presidential election—far less than the 5% cutoff that justified denying any public funds to support Stein's general-election campaign in 2016. *See Buckley*, 424 U.S. at 87–88; 26 U.S.C. § 9004. If Congress could permissibly deny all public funding for that campaign based on the lack of widespread support for the Green Party, then Congress could also take the less restrictive step of offering Stein funding as a primary candidate that was less generous than the funding provided to primary candidates of major parties.

Moreover, the Act did not even weaken Green Party candidates, in absolute terms or relative to major-party candidates. Nothing prevented Stein from declining public funds or raising money from private sources after her matching

payment period ended. Moreover, Stein faced the same basic choice as do general-election candidates: (1) raise and spend all the private funds you can, or (2) accept matching funds and agree to expenditure limits. 26 U.S.C. § 9035. *Buckley* explained that for the general election, the applicable expenditure limits do not affect minor-party candidates but severely constrain major-party candidates, thus benefitting minor-party candidates on average. Stein offers no reason to suspect that the expenditure limits for primary campaigns operate any differently. To the contrary, in recent primary election cycles, leading candidates of the major parties have declined matching funds and the ensuing expenditure limits.[1] Relative to those candidates, the funding scheme clearly strengthens the position of minor and new party candidates.

Because the public funding limits at issue are indistinguishable from those upheld in *Buckley*, we reject Stein's equal-protection challenge.

### III

Stein next argues that the FEC arbitrarily refused to consider her winding down costs during the administrative-review process. Applying its regulations, the Commission found that Stein had forfeited this issue by failing to develop it adequately in her written request for administrative rehearing. That determination was not arbitrary.

---

[1] *See* 2016 Presidential Matching Fund Submissions, https://www.fec.gov/campaign-finance-data/presidential-matching-fund-submissions/2016-presidential-matching-fund-submissions/ (last visited June 19, 2023); 2012 Presidential Matching Fund Submissions, https://www.fec.gov/campaign-finance-data/presidential-matching-fund-submissions/2012-presidential-matching-fund-submissions/ (last visited June 19, 2023). During the 2020 primary season, the FEC lacked a quorum and therefore was unable to approve any funding for presidential candidates.

To contest a repayment determination on rehearing, a candidate must "submit in writing" any "legal and factual materials demonstrating that no repayment, or a lesser repayment, is required." 11 C.F.R. § 9038.2(c)(2)(i). And the "failure to timely raise an issue" in these "written materials" is "deemed a waiver of the candidate's right to present the issue at any future stage of proceedings." *Id.* In *Robertson v. FEC*, 45 F.3d 486 (D.C. Cir. 1995), we held that the Commission may insist on strict compliance with this issue-preservation requirement. *See id.* at 491.

The FEC reasonably concluded that Stein's written request for administrative review did not adequately raise the issue of additional winding down costs. The request mentioned winding down costs only in a single sentence: "[I]t will be shown that the other findings concerning the nature of winding down expenses … cannot survive scrutiny." App. 26. And Stein submitted no supporting evidence. Under this Court's forfeiture standards, Stein's enigmatic remark would not be enough to preserve her argument that the audit's estimate of winding down costs was too low. *See*, *e.g.*, *United States v. McGill*, 815 F.3d 846, 909 (D.C. Cir. 2016) ("woefully undeveloped arguments are forfeited"); *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003) (argument raised "only summarily, without explanation or reasoning" is forfeited). And if we ourselves would hold that Stein's written submission was not enough to preserve this argument, we cannot fault the FEC for reaching the same conclusion.

In response, Stein claims to have addressed winding down costs earlier in the administrative process, in negotiating with the FEC's audit staff and in contesting its draft audit report before the Commission. But as shown above, FEC regulations required her to reassert the issue in her written submission for administrative review.

Stein next argues that the Commission should be estopped from claiming forfeiture because its audit report stated that the winding down costs "estimated" for the period between September 2018 and July 2019 "will be compared to actual winding down costs and will be adjusted accordingly." App. 14. We do not read this statement to relieve Stein of her duty to address winding down costs in her request for administrative review, which was filed near the end of that period.

Finally, Stein contends that she could not have forfeited any argument related to winding down costs incurred after she requested administrative review in June 2019. We recognize that Stein could not predict the exact amount of future winding down costs. But she could have done much more to alert the FEC that she expected those costs to exceed the estimates in the audit report—and to do so by a substantial amount. For example, Stein claims that between September 2018 and July 2019 she blew past the Commission's estimated winding down costs by over $150,000. In June 2019, she could have documented most of those costs and could have given at least a rough estimate of any further winding down costs expected in the future, which was then more than 2.5 years after the general election. Finally, even if winding down costs were continuing to accrue after June 2019, Stein could have filed a petition for rehearing from the Commission's final repayment determination in September 2021. *See* 11 C.F.R. § 9038.5(a). And in that petition, she could have explained why those later-arising costs "were not and could not have been presented during the original determination." *Id.* § 9038.5(a)(1)(iii).[2]

---

[2] Stein has moved this Court to supplement the administrative record with the written materials that she tried to submit to the FEC after its hearing on administrative review. Because we uphold the agency's forfeiture determination, we deny Stein's motion to supplement as moot.

10

IV

The matching payment period definition was constitutional as applied to Stein, and the FEC's forfeiture holding was not arbitrary. We therefore deny the petition for review.

*So ordered.*